Frederick H. MURRAY et al.,
Plaintiffs-Appellants,

v.

WILSON OAK FLOORING CO., INC.,
a corporation, Defendant-Appellee.

No. 71-1353.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1973.

Decided March 5, 1973.

Rehearing March 30, 1973.

David Ruttenberg, Chicago, Ill., for plaintiffs-appellants.

James T. Ferrini, Stephen D. Marcus, Chicago, Ill., for defendant-appellee.

Before SWYGERT, Chief Judge, CUMMINGS and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

This appeal concerns a diversity suit in tort. Plaintiff, Frederick H. Murray, appeals from a judgment *non obstante veredicto* entered on motion of the appellee, Wilson Oak Flooring Co., Inc. The sole issue presented is whether the district court, on the facts of the case, properly granted a judgment notwithstanding the verdict. Both sides agree that the law of Illinois governs the resolution of this issue.

I

The facts are undisputed for the most part. The plaintiff was the owner of a small brick residential property located in Chicago. On the evening of October 3, 1969, Murray was preparing to install a parquet-wood flooring on a portion of the second floor of this building, pursuant to a plan for overall remodeling. He planned to use Latex "45" Adhesive to hold the flooring in place. Both the

flooring and the adhesive had been received by Murray as a gift from the Kingston Tile Company, one of his business associates. Kingston, however, neither manufactured nor was the primary distributor of these items; both, instead, bore the label of Wilson, for whom the adhesive was manufactured on a private label basis by the Chicago Mastic Corporation.

Affixed to the five-gallon can of Latex "45" Adhesive were two labels, one of which, bright red and diamond shaped, set forth its message in boldface black letters having the following content, size and arrangement:

# Keep
# AWAY
# From Fire,
## HEAT and OPEN flame LIGHTS

# CAUTION

## LEAKING Packages Must be Removed to a Safe Place

# DO NOT DROP

Another label was affixed to the opposite side of the can. White with red lettering, it set forth, in part, this message:

## CAUTION: INFLAMMABLE MIXTURE
## DO NOT USE NEAR FIRE OR FLAME

N. Y. F. D. C. of A. No. 2360
**CONTAINS HEPTANE — USE IN WELL VENTILATED AREA**
Do not smoke — Extinguish flame — including pilot lights
**KEEP LID TIGHTLY CLOSED          KEEP AWAY FROM CHILDREN**

Prior to spreading any of the mastic, Murray thoroughly familiarized himself with the contents of these lables.

The second floor of the Wieland building was in the shape of an elongated rectangle. The front one-third of the floor was comprised of a living room, a work room and an entry hall; the middle one-third contained a combination billiards and dining room, a kitchen, and a storage-utility room. Murray planned to install parquet floor on the area described by the entry hall and the billiards-dining room, which he realized would require the spreading of adhesive on the floor adjacent to the kitchen and the storage-utility room. The following

floor plan, taken from an exhibit introduced at trial, indicates the arrangement of these areas; the crosshatched section represents part of the area which Murray intended to cover with parquet flooring:

The kitchen, linked to the billiards-dining room by a doorless cased opening, contained a built-in stove and oven, each of which was fitted with pilot lights: two for the stove and one for the oven. Housed in the storage-utility room were a furnace and a water heater, both gas-supplied and furnished with single pilot lights. Unlike the kitchen, however, this room was separated from the billiards-dining area by a door, nailed into place and tightly fitted into the door frame except at the bottom, where a horizontal gap existed about the width of a finger. On the night of October 3, all of the pilot lights servicing these various appliances were lit and functioning, with the possible exception of the furnace light.

Murray was aware of this fact when he began to apply adhesive to the front-most portion of the entry hall at approximately 6:00 P.M. on October 3. Three hours later he had applied adhesive to most of the area he intended to cover with flooring, working his way from his starting point back toward the kitchen and bathroom. The area was not entirely covered, however. Murray left himself an eight to ten inch path along the wall separating the billiards-dining area from the kitchen and storage-utility room, evidently to allow his return to the front of the apartment without having to tread on wet adhesive. Unfortunately, this path was never used. While on his knees near the bathroom door,

facing the front of the building and nearly finished with applying mastic, Murray heard an explosive noise, later described by him as a "whompf". This was accompanied by a bright orange flame, which Murray first observed about five feet in front of him at a location marked by an "X" on the floor plan. In an ensuing fire, Murray sustained burns which resulted in his permanent injury.

This suit for damages followed. Evidence produced at trial established that the warnings placed on the can of Latex "45" Adhesive were not in conformance with either the Federal Hazardous Substances Labeling Act, 74 Stat. 372 (1960), or the Illinois Hazardous Substances Labeling Act, Ill.Rev.Stat. Ch. 111½ § 251 et seq. To comply with those Acts, a product having the combustibility of Latex "45"—equivalent to that of gasoline—would have required labeling which read "danger" rather than "caution" and "extremely flammable" rather than "inflammable".

The evidence also established that the fire was caused when combustible vapors from the adhesive came in contact with one of the lit pilot lights, the most likely candidate being the pilot light of the water heater in the storage-utility room. Expert witnesses for both sides testified that Latex "45" emits a heavy and highly combustible vapor capable (1) of traveling for some distance along a floor from the point at which the mastic is spread, (2) of burning with explosive force upon encountering any form of exposed flame, and (3) of transmitting that flame back to the body of spread adhesive. Thus the water heater pilot was chosen as the most likely site for generating the explosion not only because it was substantially closer to the mastic than the stove pilot lights but because it was much nearer to the floor than the pilot lights on the stove, and therefore more likely to contact low-lying vapors easily capable of traveling under a door.

After hearing all of the evidence, the jury in the cause returned a verdict in favor of Murray, and assessed damages against Wilson in the sum of $20,429.00. Wilson then filed a motion for a judgment in its favor *non obstante veredicto* which was granted by the district judge. He based his decision on the following facts:

> [T]he plaintiff Frederick H. Murray admitted on the trial that at the time of the occurrence there were burners blazing and that he knew they were there. The product was plainly marked as inflammable. Said plaintiff's action was clearly a contributing cause of the explosion and fire that occurred, and he was therefore guilty of contributory negligence herein.

By "blazing burners" we take the judge to have meant the various pilot lights adjacent to the applied mastic.

## II

We have carefully considered the evidence in this case, and conclude that the trial judge erred in entering a judgment *non obstante veredicto* for Wilson. Perhaps the most crucial fact relevant to our decision is the presence of the word "near" in the primary warning on Wilson's adhesive can, a term which we think must be taken to modify subordinate warnings on the same level. The most important of these is the recitation: "Do not smoke—Extinguish flame —*including pilot lights*." (emphasis added). Reexamining the floor plan introduced as evidence in this case, and taking the evidence at its worst for Murray, it would appear that he spread mastic to within four or five feet of the water heater pilot light and within seven to eight horizontal feet of the stove pilot lights. These figures allow for the eight to ten inch path Murray left for his return to the front of the apartment.

We cannot say as a matter of law that the term "near" was sufficient to inform Murray that his spreading of adhesive within four feet of a pilot light *located behind a closed door* and within eight feet of stove pilot lights three feet off the floor exposed him to the risk of

an explosion and attendant fire damage. All of the evidence, when viewed in its aspect most favorable to Murray, fails to "so overwhelmingly [favor] movant [Wilson] that no contrary verdict based on that evidence could ever stand." Pedrick v. Peoria & Eastern R. R., 37 Ill.2d 494, 510, 229 N.E.2d 504, 514 (1967). Nearness is a matter of degree. To the president of Wilson, "near" included the entire house in which an application of Latex "45" Adhesive was taking place. The reasonable man, we think, would disagree. Thus, whether "near" fairly encompassed the door and distances of this case was a question for the jury.

This is not to say that no separation could be too small to foreclose a jury from ruling on the scope of the term "near". Two cases decided by this court recognize the existence of a threshold gap below which a judgment n. o. v. becomes appropriate. In Moschkau v. Sears Roebuck & Co., 282 F.2d 878 (7th Cir., 1960), we upheld a judgment n. o. v. where the evidence showed that the plaintiff, an experienced carpenter, had brought combustible adhesive to within eighteen inches of stove burners serviced by lit pilot lights. The limits of Moschkau were tested six years later in Borowicz v. Chicago Mastic Co., 367 F. 2d 751 (7th Cir., 1966), where we held that judgment n. o. v. was appropriate against an experienced carpenter who had left a can of inflammable mastic within three feet of stove pilot lights. In both cases the adhesive was the same type as that which caused the fire here, and the respective containers were labeled with warnings analogous in content to those set out herein. In neither case was the separation between the mastic and flame blocked by a solid impediment.

Of the two cases, Borowicz is undoubtedly the closest to the facts of this case; here mastic was applied within perhaps four feet of a lit pilot light, there the distance was three feet. A controlling distinction, however, is that Murray laid down mastic in a room that was separate and apart from the room where the flame was located, a separation made more complete by the interposition of a sturdy door. With respect to the kitchen pilot lights, seven or eight feet of horizontal distance and approximately three feet of vertical distance separated them from the mastic, a gap which is not, we think, the equivalent of a three foot distance without vertical separation for the purposes of a judgment n. o. v.

Lastly, we note two other distinctions which, though not of themselves controlling, further serve to distinguish Borowicz and Moschkau: (1) in neither case was any evidence adduced, as here, to establish a case of prima facie negligence on the part of the defendant by failure to comply with industry-wide standards of warning, and (2) Murray was not an experienced carpenter with extensive practice in using the material causing the accident complained of.

III

We must go further, however, than distinguishing Borowicz and Moschkau. In the years since those decisions, the Illinois Supreme Court has made a significant revision in the law of Illinois dealing with judgments n. o. v. and directed verdicts. The case was Pedrick v. Peoria & Eastern R. R., 37 Ill.2d 494, 229 N.E.2d 504 (1967), which announced the standard earlier referred to in this opinion:

In our judgment verdicts ought to be directed and judgments n. o. v. entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. 37 Ill.2d at 510, 229 N.E.2d at 513–514.

Wilson urges, first, that this standard represents a marked easing of the prior requirement of Illinois law respecting the grant of judgments n. o. v.; that is, that these are now easier to obtain than when Moschkau and Borowicz were de-

cided. From this they argue that the factual distinctions of the present case from *Moschkau* and *Borowicz* are of insufficient importance to overcome that precedent when read in combination with *Pedrick*. Since Wilson's premise is faulty, however, we cannot accept this argument.

Prior to *Pedrick*, two different standards had governed two species of cases. In determining when questions of negligence and contributory negligence became questions of law, Illinois courts answered in the affirmative only when "all of the evidence, viewed in its aspect most favorable to the party against whom the court would rule, was such that reasonable minds would reach the same conclusion." Pedrick v. Peoria & Eastern R. R., 37 Ill.2d 494, 502, 229 N. E.2d 504, 509 (1967). In other types of cases, Illinois courts applied an "any evidence" test, granting directed verdicts or judgments *n. o. v.* only when all of the evidence in the case, considered in its light most favorable to the party against whom the court would rule, contained no evidence in favor of the non-movant on an essential issue of the case. *Pedrick* eliminated both categories, and the standard it announced was designed to apply to all types of cases.

■ Did *Pedrick* make it easier to obtain a judgment *n. o. v.* in the former type of case, where a finding of contributory negligence as a matter of law is sought? We think not. Our chief support for this view lies in a comparison of the respective inadequacies of the two then-existent standards pointed out by the *Pedrick* Court. With respect to the "any evidence" standard, it was said:

[Neither] the any evidence rule [n]or any of its variants . . . is entirely satisfactory, for literal application thereof prohibits direction of a verdict even though the evidence relied upon in opposition is so overwhelmingly rebutted that no verdict based thereon could possibly stand. In such instances no action other than a directed verdict [or judgment *n. o. v.*] is consonant with efficiency in our judicial system and with a fair and expeditious termination of litigation. 37 Ill.2d at 510, 229 N.E. at 513.

The objection to the negligence, or "reasonable men," test was of a somewhat less pragmatic import:

Our dissatisfaction stems from the fact that there is at least a surface incongruity in a trial judge saying all reasonable men agree that the proof established the presence or absence of due care when 12 jurors have just reached a contrary conclusion. And it seems even more incongruous for reviewing courts to so state when the trial judge and jury reached the opposite result, when the trial and reviewing courts disagree or the members of a reviewing court disagree among themselves that such is the case. 37 Ill.2d at 510, 229 N.E.2d at 513.

It is thus apparent that the Illinois Supreme Court did not intend in *Pedrick* to make judgments *n. o. v.* any easier to obtain in negligence cases than had previously been the rule, while they did so intend in cases, unlike this one, which had earlier fallen under the "any evidence" rule.*

---

* Of particular pertinence to this conclusion is the following excerpt from *Pedrick*: *The fact that our "any evidence" rule has not always operated to the satisfaction of this court is manifest from the concurrent presence of the "reasonable men" test*, and the fact that there are cases in which the evidence, when viewed in its entirety and in its aspect most favorable to the party against whom the court would rule, so overwhelmingly favors one party that an opposite verdict must always be set aside irrespective of the number of times the case may be tried even though some evidence exists which supports the verdict and satisfies the "any evidence" rule. Under such circumstances there is no real reason for trial judges to continue to submit the case to successive juries. . . . 37 Ill.2d at 504, 229 N.E.2d at 510. (emphasis supplied)

The judgment of the district court is reversed, and the case remanded with instructions to reinstate the verdict of the jury.

Cummings, Circuit Judge, dissents.