**GREGORY'S CONTINENTAL COIFFURES & BOUTIQUE, INC., Plaintiff–Appellee,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant-Appellant.**

No. 75–2021.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1976.

Decided June 25, 1976.

James T. Ferrini, Chicago, Ill., for defendant-appellant.

George C. Rabens, Chicago, Ill., for plaintiff-appellee.

Before SPRECHER, Circuit Judge, HASTINGS, Senior Circuit Judge, and MARKEY, Court of Customs and Patent Appeals.*

MARKEY, Chief Judge, Court of Customs and Patent Appeals.

## BACKGROUND

Gregory's Continental Coiffures & Boutique, Inc. (the Insured) brought this diversity action in the district court to recover, on a policy of insurance issued by the St. Paul Fire & Marine Insurance Company (the Company), for damage to its business premises. The damage occurred on April 11, 1972, from a fire of incendiary origin.

As separate and alternative defenses, the Company sought to prove, inter alia, that the Insured, through its officers and agents, caused the fire, and that the Insured fraudulently over-valued the amount of the loss under oath executed by Mr. George Xilas, owner and president of the Insured. Both defenses were withdrawn from the jury; a verdict was directed in favor of the Insured,

and the case was submitted to the jury on the sole issue of damages, which the jury assessed in the amount of $83,000.00. The Company appeals. We reverse.

### The Arson Defense
### The Drums

There was testimony by several officers of the Chicago Fire Department that upon their arrival at the business premises, a beauty salon and boutique, after the fire and during the early morning hours of April 11, 1972, they found the remains of five plastic drums in the shampoo room. The liquid residue within those drums established that they had contained gasoline.

Mr. John Morgan, the police bomb and arson investigator, testified that he examined the drums and found the name of the manufacturer printed on the bottom. The manufacturer, the Kirkle Company located in Hastings, Nebraska, was contacted, and the local distributor was identified as the American Plastics Container Company. Mr. Mario Tanzi, an employee of the distributing company, was identified, and the drums were further traced to the Home Freight Lines Company where a Mr. Larry Riley was interviewed.

Tanzi testified that his company had purchased some fifteen-gallon drums from Kirkle to service an order placed by an individual who had come into Tanzi's office and who had identified himself as "Mr. Mavros." The invoice for the eight drums that were sold was identified. The shape of the drums was identified.

Tanzi identified Xilas as the "Mr. Mavros" who purchased the drums and who also appeared on a second occasion to pick up the drums. Tanzi said he directed Xilas to the trucking firm where the drums could be picked up. Riley testified that two individuals picked up the drums and that one of those individuals was Xilas, whom he identified.

Xilas testified that he knew a Mr. Mavros, that they had first met sometime be-

* Chief Judge Howard T. Markey, United States Court of Customs and Patent Appeals, sitting by designation.

fore New Year's Eve of the year 1972. He also testified that he and Mavros had purchased some plastic drums sometime before April of 1972, for the purpose of use in a Xilas-Mavros business venture involving the shipping of shampoo to Greece.

Mavros, however, was never produced at the trial. Despite an alleged close personal and professional relationship between the two men, Xilas testified that he never saw Mavros again after they picked up the drums. The Company alleged that it had made unsuccessful efforts to locate Mavros.

On cross-examination, Xilas was unable to deny that the drums he had purchased were the same drums that were used to perpetrate the arson.

### Insured's Financial State

The Company also introduced evidence on the financial condition of the Insured prior to the fire, alleging that its perilous financial condition provided the motive for the commission of arson.

Mr. Norman A. Matson, a certified public accountant, testified that in his opinion, based upon a reasonable degree of accounting certainty, the Insured was in a "very shaky" financial condition as of April 11, 1972. He based that opinion in part upon his examination of federal income tax returns of the Insured for the years 1969 and 1970 which indicated that "the liabilities of this business exceeded the assets." Matson further testified that in each of those years there had been a very significant bank overdraft and a very substantial liability to both federal and state governments. In Matson's opinion those factors indicated that the business was having financial difficulty.

Mr. Theodore Varouxakis, the Insured's accountant, was called as a witness for the Insured. He testified on cross-examination that as of December 31, 1971, the Insured owed the Government $16,565.85 for both withholding taxes collected from employees and its share of F.I.C.A., and that $660 was

owed as unemployment compensation tax. Varouxakis further testified that Mr. and Mrs. Xilas, sole shareholders of Insured, had lent it $32,784.00, that Xilas was selling his home in order to infuse the proceeds into the Insured, and that the Insured had a sales tax delinquency of about $5,000.00.

### The Locked Doors

It was also brought out at trial that the building occupied by the Insured beauty salon and boutique was a highrise twin-tower apartment building. There were only two entrances to the boutique, each of which was located on the west side thereof and each of which opened onto the corridor or hall of the building. Although both of the doors had locks, the main door marked "entrance" was apparently the only door used by customers and employees, and the second door remained locked at all times. There were windows along two sides of the building which were always locked.

Mr. Chester Walczak, a security officer assigned to the building occupied by the Insured, testified that the premises were secured "prior to the fire." There was also testimony by two firemen who responded to the blaze that the windows had been blown outward, as there was no glass found on the inside of the building.

Mr. James Everly, the driver of one of the fire trucks, testified that the firemen were having difficulty gaining entrance to the premises through the main glass door, so he assisted them by breaking the glass door with the pick of his axe.

Xilas testified that he and two of his employees, Maxine Paris and Inelle Davis, had the only keys to the premises. There was no evidence that would indicate that either of these employees might have had any reason to start the fire.

### The Fraud Defense

The Company also presented evidence at trial for the purpose of proving that the Insured had fraudulently exaggerated the amount of the loss to the Company, thus voiding the policy.[1] Specifically, the Com-

---

1. The policy provision relied upon provides: *Concealment, fraud.* This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresen-

pany alleged that the merchandise inventory claim of $39,461.17 was a fraudulent overvaluation.

The merchandise inventory claim of $39,461.17 set forth in the proof of loss was, according to Xilas' testimony, based in part on his determination of the number of ladies garments in the boutique at the time of the fire. He testified that approximately 1200 garments were lost. That determination was based on an inventory taken by Xilas on December 31, 1971 and a subsequent inventory taken in March 1972 which reflected additions to inventory made by the buyer, Belle Russ. This last inventory was a regular monthly inventory which involved an actual count of the garments.

The Company introduced photographs into evidence which were taken to depict an inspection of the premises taken by Mr. Carl Scheel on the date of the fire. He testified "that there were hardly any contents available," and all of the garments he observed during his inspection were depicted in the photographic exhibits.

Belle Russ testified that on April 11, 1972 there were only a "couple of hundred" garments on the premises. She also testified that defendant's photographic exhibits were an accurate reflection of the density of the stock immediately prior to the fire.

Matson testified regarding the $39,461.17 inventory claim. The 1971 tax returns indicated a boutique inventory on December 31, 1971 of $29,300.00. That figure was supplied to Varouxakis by Xilas and it was used to calculate the reported inventory claim. Matson testified that, in his opinion, the year-end figure and the resultant claim were incorrect. He noted that gross sales in the 1969 tax return were $293,000.00. Of that amount, $96,745.34 represented boutique sales. The beginning inventory for the year was $4,638.00 and purchases were $76,130.00. Subtracting therefrom the closing inventory ($9,785.40) and the cost of goods returned ($5,576.82), the net amount

was used to calculate a cost of sales percentage for 1969 of 67.607.

Like calculations made for the year 1970 established the cost of merchandise to be 65.62% of gross sales. By contrast, however, the cost of merchandise calculation for 1971, based upon the tax return for that year, was only 44.9%. Matson further testified that this dramatic decrease in cost of merchandise was "very unrealistic," and that in his opinion the cost of sales percentage for boutiques and specialty shops of the kind in question was about 60. Matson concluded that in his opinion the closing inventory for 1971 was only $4,680.00, not the $29,300.00 claimed by the Insured.

Matson then recalculated the merchandise inventory as of April 11, 1972 based upon the 200-garment figure supplied by Russ. Based on those calculations, the merchandise inventory was determined to be $6,576.00.

## OPINION

 The sole issue in this appeal is whether the district court erred in directing a verdict for the Insured. The Illinois Supreme Court has provided the following standard, which is applicable here, on the subject of judgments *n.o.v.* and directed verdicts:

> In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.

*Pedrick v. Peoria & Eastern R.R.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513–514 (1967).

This court commented favorably on the above standard in *Murray v. Wilson Oak Flooring Co.*, 475 F.2d 129 (1973, 7th Cir.). Though a judgment *n.o.v.* was involved in *Murray*, the standard is specifically applicable with equal force to motions for directed verdicts.

ted any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any

fraud or false swearing by the insured relating thereto.

Our review of the entire record in this appeal leads us to conclude that the trial judge erred in withdrawing both defenses from the jury and directing a verdict in favor of the Insured.

### The Arson Defense

■ The district court was apparently convinced that there was insufficient evidence from which a jury might find that the drums found in the debris were the same drums previously purchased by Xilas. He observed that two of the firemen called to testify had stated that the drums were only of five-or ten-gallon capacity. The witnesses' failure to precisely identify the capacity of the drums, based on a purely visual inspection, did not warrant withdrawal of the issue of arson from the jury. Resolution of any apparent conflict in the evidence was the function of the jury, not that of the judge.

■ The manufacturer of the drums was identified and contacted. The distributor was located. It was established that Xilas had recently purchased drums of a like kind from that distributor. That is strong circumstantial evidence tending to show and from which a jury may have concluded, that the drums used in the perpetration of the arson were the same drums purchased by Xilas sometime prior to the blaze.

The district court also apparently gave great weight to the evidence that Xilas was out of the country immediately prior to and at the time of the fire. Xilas' alibi could not, of course, have been found to be conclusive on the issue of arson. The alibi does not rule out a reasonable inference, which the jury might have made, that Xilas had procured someone else to set the fire and that he had given that person or persons his key to the premises in furtherance of the scheme. In such event, and given the additional permissible inferences that the jury might have drawn from the evidence, Xilas' alibi would be consistent with a finding that Xilas procured the arson. It was the province of the jury to weigh Xilas' testimony and to determine the significance of

his alibi evidence in the light of all evidence of record.

The evidence that access to the premises was limited and that there was no forced entry may have led the jury, if permitted to consider it, to find that the arsonist had a key. Only Xilas had both a key and an apparent motive to commit arson. Such evidence could well have resulted in a jury determination that Xilas had procured someone to start the fire and that he had given that individual a key to the premises in furtherance of the scheme. *Stein v. Girard Ins. Co. of Philadelphia*, 259 F.2d 764 (7th Cir. 1958).

■ There was also sufficient evidence to go to the jury on the issue of Xilas' motive to commit arson. The district court commented that Matson's testimony was "speculative at best" and that it was based solely on Matson's own interpretation of the Insured's records. He further commented that the Insured:

[I]ntroduced testimony of its bookkeeper, who established that the business was doing well, that creditors were promptly paid, and that the stores were well maintained at all times. Further, plaintiff's Federal Income Tax return showed that the business had made a profit during the preceding year.

But that characterization was one for the jury to make. Matson used, as a basis for his analysis, the best and only evidence that was available to him—the income tax returns and accompanying work papers of the Insured. Matson was a qualified expert witness, and his analysis and interpretation of those records may well have been credited by the jury. It was, of course, the jury's basic function to judge the witness' creditability and the reliability of his testimony. If the jury had disbelieved Xilas and believed Matson, it might have reached an unassailable conclusion that Insured's shaky financial condition was the motive for the procurement of the arsonist.

Arson is often incapable of direct proof, and evidence thereof is often necessarily circumstantial. We agree with the Company that the circumstantial nature of the

evidence was not fatal to its defense herein and did not warrant a directed verdict in favor of the Insured on the defense of arson. See *Commerce Union Bank v. Midland National Insurance Co.*, 53 Ill.App.2d 229, 202 N.E.2d 688 (1964).

### The Fraud Defense

The district court concluded in its memorandum opinion that "as a matter of law . . . there was insufficient evidence of willful misrepresentation to warrant submission of the issue to the jury." This conclusion was based on the court's "evaluation of witnesses and the bases of their knowledge . . ." and was further predicated on its acceptance of Xilas' explanation as to how he arrived at his estimate of 1200 garments lost in the fire.

 Ordinarily, the existence of fraud is a question of fact to be determined by the jury, or by a trial court sitting without a jury. *Tenore v. American and Foreign Insurance Co. of N.Y.*, 256 F.2d 791 (7th Cir. 1958).

 The evidence herein provided adequate basis upon which a jury might have found that the actual inventory at the time of the fire was substantially less than that claimed. As the buyer for the Insured, Russ was in a unique position to know the actual inventory on the date of the fire. Her estimate of 200 garments in the boutique as of April 1972 was erroneously disregarded by the district court in determining the sufficiency of evidence to go to the jury. The Company's exhibits 19, 20, 25, 51 and 52, which depicted areas of the store where garments had been stored, might have conformed to the jury Russ's estimate of 200 garments. The same is true of Scheel's testimony that all of the garments in the store were depicted in the exhibits and of Matson's inventory calculations.

The Insured argues, however, that even if the jury were to find a substantial overstatement of the amount of the loss, that would not in itself be sufficient to establish a fraudulent intention on the part of the Insured. We disagree. In order for Xilas to support the merchandise inventory claim, it was necessary for him to estimate under oath that there were approximately 1200 garments in inventory. If the jury had been allowed to find, based on the evidence, that there were only 200 garments on the premises, we think that such a gross overvaluation, sworn to by Xilas, would of itself support an inference by the trier of fact that the overvaluation had been deliberate and intentional. The intent to defraud is, as this Court observed in *Tenore*, supra, inferred by the making of a false statement because "the law presum[es] every man to intend the natural consequences of his acts."

### Conclusion

For the foregoing reasons, we vacate the judgment of the district court and remand the case for a new trial, subject to Circuit Rule 23.