James D. ARMS, et al.,
Plaintiffs-Appellees,

v.

STATE FARM FIRE & CASUALTY
COMPANY, Defendant-Appellant.

No. 83–5470.

United States Court of Appeals,
Sixth Circuit.

Submitted Jan. 11, 1984.

Decided April 13, 1984.

Dennis H. Inman, Taylor, Tilson, Inman & Reams, Morristown, Tenn., for defendant-appellant.

Fred L. Myers, Sr., John William Myers, Myers & Myers, Newport, Tenn., for plaintiffs-appellees.

Before KENNEDY, MARTIN and CONTIE, Circuit Judges.

CONTIE, Circuit Judge.

Plaintiffs James and Rose Mary Arms brought this action to recover the proceeds of a fire insurance policy covering a residence in Newport, Tennessee. The action was filed in Cocke County, Tennessee, Circuit Court, but was removed to federal court on the basis of diversity of citizenship. A jury trial was held on April 6, 1983. At the close of the evidence, the district judge granted the plaintiffs' motion for a directed verdict. Defendant State Farm Fire & Casualty Company now appeals.

State Farm's sole defense at trial was that the Arms had either deliberately set the fire themselves or hired someone to set the fire on their behalf. The sole question on review, therefore, is whether State Farm presented sufficient evidence of arson by or on behalf of the Arms to raise a jury question. We conclude that sufficient evidence was presented and that the district judge erred in taking the case from the jury.

## I.

The entire trial transcript consists of only 55 pages. We can therefore summarize the testimony offered at trial with no great difficulty.

The parties stipulated that the residence was insured by State Farm and that it had been totally destroyed by fire. The parties also stipulated the amount of damages. It was stipulated that if the Arms were entitled to recover anything, they were entitled to recover $24,081.82.

Plaintiff James D. Arms testified on his own behalf. He stated that he had purchased the Newport residence in 1974 and that he and his wife had lived there until 1981. In February of 1981, Mr. Arms obtained employment in Jonesboro, Tennessee. Jonesboro, Mr. Arms testified, is approximately 50 miles from Newport. For a period of time, Mr. Arms commuted between the Newport residence and his work in Jonesboro. In March of 1981, the Arms purchased a home in Jonesboro. The purchase price of the Jonesboro home was $33,900.00. The Arms obtained the house by assuming an $18,000.00 mortgage on the Jonesboro home, by borrowing $11,000.00 on a six-month note from First Tennessee Bank, and by refinancing their existing mortgage on the Newport residence to obtain an additional $5,000.00. This refinancing caused the interest rate on their Newport mortgage to rise to 18%.

At the same time that the Arms purchased the Jonesboro home, they listed the Newport residence for sale with a realtor. The residence was listed for sale at $23,500.00. The Arms chose this price to facilitate a "quick sale." Mr. Arms testified that he and his wife sought a quick sale in order to ease the financial burden caused by the indebtedness incurred to acquire the Jonesboro home. The Arms' attempts to sell the Newport residence were unsuccessful.

During this time, the summer months of 1981, the Arms leased the Newport residence for $150.00 a month. The $150.00 was to be used to meet the mortgage payments on the Newport residence. A dispute of an undisclosed nature arose with the tenants of the Newport residence and the Arms never received any rent from them. As a result, the Newport mortgage fell two months into arrears. In September of 1981, the Arms received a bank notice concerning their past due mortgage payments. Counsel for State Farm charac-

terized the notice as a "dunning letter"; Mr. Arms referred to it as a "friendly reminder." Mr. Arms testified that the payments on the Newport mortgage were subsequently brought up to date. Around this same time, the Arms "removed" the tenant from the premises.

The listing agreement with the real estate agency expired in September of 1981 and the Arms did not renew it. Also in September of 1981, the $11,000.00 note came due with interest owed in an amount slightly less than $1,000.00. The Arms were unable to pay either the principal or interest on the note and had to refinance the obligation by signing a second note. Mr. Arms was asked on cross-examination if he was not "pretty well strapped financially." He admitted that he was "fairly well" strapped.

On October 6, 1981, the Arms received a letter from State Farm informing them that their insurance policy on the Newport residence required that the house be occupied and that because the house was vacant the policy would be cancelled effective November 3, 1981. Mr. Arms testified that he did not attempt to seek other insurance coverage and that at this time he had "no prospect" for selling the Newport residence.

On the evening of October 21, 1981, a fire occurred at the Arms' Newport residence. This fire, which originated in the rear of the house, caused significant damage but did not irreparably harm the residence.

On October 30, 1981, a second fire occurred, this time originating in the front portion of the house. After this fire, the residence was irreparably damaged.

Mr. Arms testified that at the time of both fires he was in Jonesboro, approximately 50 miles away.[1]

State Farm called Grover Dunn to testify as an expert witness. He testified that chemical analysis performed on samples of debris collected after each of the two fires revealed the presence of hydrocarbon accelerants, such as gasoline or kerosene, in seven out of the nine samples. He also testified that upon arriving at the Newport residence after the first fire, he smelled an odor characteristic of gasoline or kerosene. Mr. Dunn further testified that in his opinion both fires were of an incendiary origin.

Richard Snyder, a Senior Field Claims Representative of State Farm, also testified for the defense. He stated that, upon arriving at the Newport residence after the first fire, he smelled an odor characteristic of gasoline or kerosene. He further testified that it would have cost $7,500.00 to $10,000.00 to repair the house after the first fire. He stated that the second fire was "substantially larger" than the first. This fire was centered in the front portion of the residence and it "damaged areas that were not fire damaged the first time." Mr. Snyder testified that the cost to repair the house after the second fire exceeded the worth of the home; it was thus a total loss.

Upon questioning by defense counsel, Snyder explained the different consequences of partial and total losses. After a partial loss occurs, the residence is repaired and State Farm issues a check to the insureds with the contractor as a lienholder. Upon a partial loss, no funds are paid to the mortgagee of the residence. Upon a total loss, however, State Farm is required by law to pay off the mortgagee, releasing the insureds from the mortgage. Snyder testified that a mortgagee is paid, in the case of a total loss, regardless of the insureds' responsibility for the fire.

Snyder testified that State Farm, after determining to its satisfaction that arson was involved, conducted an investigation to determine who might have had a motive to destroy the residence. Snyder testified that State Farm could not identify any persons, other than the Arms, who would have had such a motive.

After briefly recalling Mr. Arms to the stand as an adverse witness, State Farm rested its case. Counsel for the Arms then

---

1. Mrs. Arms testified briefly. She testified that she agreed with her husband's testimony.

moved for a directed verdict. The district judge granted the motion, explaining that,

I don't think you have got anything here. You have got a person who has, in the economic climate in which he finds himself, he was in a rather tight position financially. But, because people get in tight positions financially, and then go around burning up houses [sic]. I don't think there is any evidence here to indicate the Arms, either one of them, had anything to do with the burning of the house. They weren't near it. They were home and wherever they live 50 miles plus away.

I don't think there is any evidence here, and the motion will be granted.

After the jury was brought back into the courtroom, the district judge explained what had happened.

Ladies and gentlemen, what has happened here is that the plaintiffs moved for judgment at the close of the plaintiffs' presentation, and the Court has granted it. The Court granted it because there is no evidence in this case that the Arms, that either of them set fire to the house or caused it to be burned. All the insurance company showed was Arms were in a tight financial position at the time. That doesn't say they went out and burned the house down. People don't do that. They survive. They don't have to go and burn houses down, and

there is no evidence to indicate that they did.

You can stretch it and say they had a motive, but did they follow through with the motive. There is no evidence that they did at all. So, the Clerk will enter a judgment in favor of the plaintiffs.

State Farm's motion for a new trial was denied. State Farm thereafter filed a timely notice of appeal.

## II.

A federal court exercising its diversity jurisdiction applies the standard for a directed verdict used by the courts of the state whose substantive law governs the action. *Foster v. Caterpillar Tractor Co.,* 714 F.2d 654, 656 (6th Cir.1983); *Gootee v. Colt Industries Inc.,* 712 F.2d 1057, 1062 (6th Cir.1983); *Gold v. National Savings Bank,* 641 F.2d 430, 434 (6th Cir.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981).[2] Tennessee courts require that a trial court presented with a motion for a directed verdict must,

take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be draw from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

---

**2.** Although the rule stated in the text is well established in this circuit, we note that there is some disagreement among the other circuits on the effect of state law on the standard for directing a verdict in a federal court sitting in diversity. *Compare Matador Drilling Co. v. Post,* 662 F.2d 1190, 1196 (5th Cir.1981) *and Boeing Co. v. Shipman,* 411 F.2d 365, 368–70 (5th Cir.1969) (en banc) (holding that the federal standard for directed verdicts applies in diversity cases) with *Kuziw v. Lake Eng'g Co.,* 586 F.2d 33, 35 (7th Cir.1978) *and Illinois State Trust Co. v. Terminal R.R. Ass'n,* 440 F.2d 497, 500 (7th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 100, 30 L.Ed.2d 96 (1971), (holding that state law governs the standard for a directed verdict in a federal court sitting in diversity). *Cf. Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 970–71 (7th Cir. 1983) (noting inconsistent decisions within the Seventh Circuit). *See generally Dick v. New*

*York Life Ins. Co.,* 359 U.S. 437, 444–45, 79 S.Ct. 921, 925–26, 3 L.Ed.2d 935 (1959) (noting the split of authority among the circuits); *Byrd v. Blue Ridge Rural Elec. Coop., Inc.,* 356 U.S. 525, 538, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958) ("there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts").

It is worth noting that this circuit follows federal, not Tennessee, law on the standard for granting a new trial in a diversity case. Tennessee courts allow the trial judge to sit as a "thirteenth juror" when passing upon a motion for a new trial. Federal diversity courts sitting in Tennessee do not apply this standard, but instead apply the federal standard. *See, e.g., Werthan Bag Corp. v. Agnew,* 202 F.2d 119, 122 (6th Cir.1953); *Sandlin v. Pearsall,* 427 F.Supp. 494, 495 (E.D. Tenn.1976).

*Holmes v. Wilson,* 551 S.W.2d 682, 685 (Tenn.1977). *See also Sauls v. Evans,* 635 S.W.2d 377, 379 (Tenn.1982); *Crosslin v. Alsup,* 594 S.W.2d 379, 380 (Tenn.1980). In both the Tennessee and federal court systems, an appellate court reviewing a trial court's action on a directed verdict motion applies the same standard as used in the trial court. *See Holmes,* 551 S.W.2d at 685; *Gootee,* 712 F.2d at 1062.

Thus, the precise question before this court is whether, taking the strongest legitimate view of State Farm's evidence, allowing all reasonable inferences in State Farm's favor, and disregarding all countervailing evidence, there is any doubt as to the conclusion that the Arms were not responsible for the fire. In other words, we must determine whether the only conclusion that a reasonable mind could reach is that the Arms did not deliberately cause the loss.

### III.

■ We have been unable to locate any Tennessee authority stating the minimum quantum of evidence necessary to withstand a motion for a directed verdict in cases of this type. In the absence of such authority we are guided by applicable principles of state law and by relevant decisions of other jurisdictions. *Winston Corp. v. Continental Casualty Co.,* 508 F.2d 1298, 1304 (6th Cir.), *cert. denied* 423 U.S. 914, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975).

Arson cases typically are difficult to prove. It has been stated that it is rarely "possible to prove the actual lighting of the match." *Klein v. Auto Owners Insurance Co.,* 39 F.R.D. 24, 26 (D.Minn.1965). Therefore, "courts have long recognized that [arson] can be established in civil cases by circumstantial evidence." *Elgi Holding, Inc. v. Insurance Co. of North America,* 511 F.2d 957, 959 (2d Cir.1975).

■ The reported cases from jurisdictions other than Tennessee that deal with the sufficiency of the evidence to establish arson by an insured are legion. The salient features of the present case are that the jury was presented with strong evidence of the financial difficulties of the Arms and of the incendiary origin of the fire. The jury was also presented with additional inculpatory circumstances: First, there were two fires in a short period of time and the second fire complemented the first in such a way that the combined effect of the two fires was to cause a total loss. Second, the Arms' insurance was to expire within several days of the second fire. Against this evidence is Mr. Arms' unequivocal denial that he or his wife caused the fire to be set and his assertion that he was in Jonesboro at the time of both fires.[3] Several courts have upheld jury verdicts where, as is the case presently before this court, there was evidence of arson and financial motive plus some other circumstance tending to cast suspicion upon the insured. *See, e.g., Lockamy v. United States Fidelity and Guaranty Co.,* 652 F.2d 753, 754 (8th Cir. 1981); *Elgi,* 511 F.2d at 959; *Boone v. Royal Indemnity Co.,* 460 F.2d 26, 29 (10th Cir.1972). *See generally Goodwin v. Maryland Casualty Co.,* 233 F.Supp. 81, 83 (E.D.Okla.1964) ("motive plus the incendiary origin of the fire, would, in the absence of believable rebuttal evidence, be sufficient to sustain the affirmative defense"). *Cf. Martens v. Sentry Insurance Co.,* 491 F.Supp. 1390, 1391 (E.D.La.1980) (findings of fact in bench trial). We agree with these courts that evidence of this nature is sufficient to warrant submission of the case to the jury.

■ Mr. Arms' claim that he was 50 miles away at the time of the fires and his denial that he or his wife participated in the fire simply presented jury questions. In Tennessee, "[i]nterest alone is enough to make a witness' credibility a question for the jury and a verdict may not be directed upon the testimony of an interested wit-

---

3. Neither Mr. Arms nor Mrs. Arms testified as to Mrs. Arms' whereabouts at the time of the two fires.

ness even though he is not contradicted, impeached or discredited." *Price v. All-State Insurance Co.*, 614 S.W.2d 377, 379 (Tenn.App.1981). *Cf. Gregory's Continental Coiffures & Boutique, Inc. v. St. Paul Fire & Marine Insurance Co.*, 536 F.2d 1187, 1191 (7th Cir.1976) (the alibi that the insured was out of the country at the time of the fire "does not rule out a reasonable inference, which the jury might have made, that [the insured] had procured someone else to set the fire").[4]

■■■■ This conclusion is supported by general principles of Tennessee law relating to the use of circumstantial evidence. In Tennessee, a fact may, of course, be proven by direct evidence, circumstantial evidence, or a combination of the two. *Browder v. Pettigrew*, 541 S.W.2d 402, 405 (Tenn.1976). Also, a "fact may be inferred from circumstantial evidence and such fact may be the basis of a further inference to the ultimate or sought-for fact." *Stinson v. Daniel*, 220 Tenn. 70, 414 S.W.2d 7, 11 (1967). Finally, Tennessee follows the rule that circumstantial evidence is sufficient to create a jury question if the inference the opponent of a directed verdict motion seeks to establish is more probable than a conflicting inference which the proponent of the motion seeks to establish. If reasonable minds could differ over the question of whether the probabilities of the conflicting inferences are equally balanced, then a jury question is presented. *See Browder*, 541 S.W.2d at 405; *Law v. Louisville & N.R. Co.*, 179 Tenn. 687, 699, 170 S.W.2d 360 (1943) (concurring opinion); *Young v. Reliance Electric Co.*, 584 S.W.2d 663, 666 (Tenn.App.1979); *Noe v. Talley*, 38 Tenn. App. 342, 274 S.W.2d 367, 369 (1954); *Finks v. Gillum*, 38 Tenn.App. 304, 273 S.W.2d 722, 726 (1954). *See generally*

*Pennsylvania Railroad v. Chamberlain*, 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L.Ed. 819 (1933).

The second and third rules of Tennessee law noted above are particularly helpful in analyzing the present case. The ultimate inference that State Farm seeks to establish is that the Arms either set the fire themselves or obtained the services of an arsonist. This ultimate inference depends upon several primary inferences. The first necessary inference is that the Arms had a motive to burn the house. From the facts presented at trial relating to the Arms' financial condition and their fruitless attempts to sell the house, we can not say that no reasonable jury could find that State Farm's inference—that the Arms had a motive—is more likely true than the contrary inference—that the Arms did not have a motive. The next necessary inference is that the Arms acted upon this motive. The Arms would seek to draw several contrary inferences from the evidence presented. The first such inference is that the house was burned accidentally. From the testimony of Grover Dunn, the inference that *someone* intentionally destroyed the house is clearly more likely true than the contrary inference that it burned by accident. The next contrary inference that the Arms would rely on is that some other person, a stranger to the Arms, caused the fires. It is at this analytic juncture, in our opinion, that the present case is resolved. The crucial question under Tennessee law is whether a reasonable jury could find that the inference that the Arms caused the destruction of the house is more likely true than the inference that the fire was caused by some other unknown person. We believe that a reasonable jury could reach such a conclusion.

---

4. The district judge clearly misconceived his role under Tennessee law. In granting the directed verdict, he stated that the Arms "were home and wherever they lived 50 miles plus away," thus crediting Mr. Arms' testimony. This determination usurped the jury's fact-finding function.

Similarly, the following remarks of the district judge reveal that his decision was based on his understanding of human nature:

> All the insurance company showed was Arms were in a tight financial position at the time. That doesn't say they went out and burned the house down. People don't do that. They survive. They don't have to go and burn houses down ....

This too intruded upon the jury. Determining how persons react to a given situation is a function uniquely appropriate for the jury.

First, the Arms presented little evidence tending to show that someone else set the fire. Arms testified that on the occasions when he had been to the house between the time he and his wife had moved out and the time of the first fire, he "never found any evidence of forced entry" into the house. He also testified, however, that he "found empty Coke cans, potato chip wrappers, and stuff like that, looked like somebody had a picnic in the back bedroom." The jury was given no explanation of how this picnic might have occurred if there had been no forcible entry into the house. Indeed, the testimony of Mrs. Arms tends to corroborate the conclusion that the refuse referred to by Mr. Arms had been left by the tenants.

Q: With regard to Mr. Arms' testimony about the Coke cans, and what not, in the house.

A: Yes.

Q: After the Farris' left in September, 1981, approximately one month before the fire, you never saw any evidence of anyone else being in the house?

A: No, sir.

Q: The house was pretty messy from the Farris' there, but as far as anybody else being in the house other than the Farris' after they left, you never saw any evidence?

A: No.

Q: You were there with Mr. Arms?

A: Yes, sir.

Mr. Arms also testified that he noticed after the first fire that a device fastening a padlock to the garage door had been pried loose. Mr. Arms testified that the "Fire Department" told him that they had not pried this lock, but he also admitted that he had not asked every fireman.

In evaluating the probability of the inference that some unknown person caused the loss as compared to the probability that the Arms caused the loss, it is significant that neither the Arms nor State Farm were able to identify any other person with a motive to engage in the arson. It should also be noted that although the small amount of evidence of forcible entry is consistent with the inference that some unknown person caused the fire, it is also not inconsistent with the inference that Arms caused the fire and manufactured the evidence of forcible entry to cover their tracks.

In sum, the following evidence at trial tends to support the Arms' inference that some stranger caused the fire: (1) Mr. Arms testified that a padlock had been forced.

By way of contrast, the following evidence supports State Farm's opposite inference, that the Arms caused the fire: (1) the Arms were experiencing financial difficulty, were "fairly well" strapped financially, had fallen into arrears on one debt, had to refinance another obligation, and had lost a source of income (the tenancy) which they had planned to use to satisfy one debt; (2) the Arms had no need for the residence, as is demonstrated by the fact that they had tried, without success, to rid themselves of the property at a "quick sale" price; and (3) the insurance on the residence was to be cancelled within several days of the fire that completely destroyed the residence and the Arms had taken no steps to secure new insurance. Moreover, although the phenomenon of an apparently motiveless arsonist striking in a random fashion is not unknown, to believe the Arms' inference would require positing a firebug who, after his first attempt only partly destroyed the house, returned a mere nine days later, and a mere four days before the insurance was due to expire, to set a fire in a different part of the house so that the combined effect of the two fires was to totally destroy the structure.

Based on the above analysis, we conclude that a reasonable jury could find State Farm's inference that the Arms caused the fire to be more plausible than the contrary inference that some unknown person caused the fire. Nothing in this opinion, of course, is meant to indicate a belief that the fire was actually caused by the Arms; rather the foregoing merely illustrates that a jury question was presented. According-

ly, the district court erred in directing a verdict for the Arms. The judgment of the district court is REVERSED and the case is REMANDED to the district court for a new trial.

CORNELIA G. KENNEDY, Circuit Judge, dissenting.

I agree with the majority of the panel that arson may be proved by circumstantial evidence and that State Farm is entitled to the benefit of every inference favorable to it which may be fairly drawn. However, the circumstantial evidence here was simply insufficient. In addition to proving motive and the fact that the fire was of incendiary origin there must be evidence that the insureds had an opportunity to set the fire, or of some additional circumstance that establishes culpability.

> Generally, opportunity is considered to be something more than proof that there was a possibility that the owner might physically have been able to set off the fire.

*Powell v. Merrimack Mutual Fire Insurance Company*, 667 F.2d 26, 29 (11th Cir. 1982).

There was no evidence placing either of the Arms at or near the scene of the fire. The only evidence was their testimony that they were at Jonesboro, Tennessee, 50 miles away. Mr. Arms testified that when he came to the home the day following the first fire, he observed that the garage door in the rear of the house was not fastened. The door had been padlocked, but the hinge that held the padlock had been pried loose from the door. He also testified on cross-examination that he asked the fire department about this and was told they did not do it, that the house was totally open when they arrived. Thus we do not have a case where the insureds had the only opportunity for entry.

The Arms' credibility was not challenged by any evidence of inconsistent statements or questionable actions. The insurance policy had been taken out while they were living in the home. Their circumstances were straitened but not desperate. They had rented the insured premises for the amount of the mortgage payments, although they had not been able to collect the rent and the tenants had moved out. They had planned to use the rent to make the mortgage payments.

Numerous cases are cited in Couch, Cyclopedia of Insurance Law 2d, § 74.668 (rev. ed. 1983), in which the evidence was held to be sufficient to permit a finding of arson by the insured. In each case there was some additional circumstance beyond motive and an incendiary fire, such as securing excessive insurance, making an inflated claim, claiming loss of property which was not on the insured premises, removing possessions before the fire, or evidence of opportunity to set the fire. State Farm has cited us to no case where motive and incendiary fire alone have been held to be sufficient to permit a finding of arson by the insureds.

In *Quast v. Prudential Property and Casualty Company*, 267 N.W.2d 493 (Minn.1978), cited by appellant, there was evidence of opportunity. The insured testified he had left the premises at 7:00 p.m. after locking them and claimed to have been in a bar until the raging fire occurred at 10:00 p.m. There was also evidence that the insured had attempted to secure excessive insurance.

In *Elgi Holding, Inc. v. Insurance Company of North America*, 511 F.2d 957 (2d Cir.1975), the only other case cited by State Farm, the insured had secured an income continuation policy immediately prior to the fire. He had written bad checks and had outstanding judgments and liens against him. More importantly, although he denied complicity in the fire his "testimony was often contradicted by other evidence." *Id.* at 959.

Similarly, in each of the cases cited by the majority there was an additional circumstance beyond motive and an incendiary origin of the fire.

In *Boone v. Royal Indemnity Company*, 460 F.2d 26 (10th Cir.1972), in holding that the verdict for the insurance company

was supported by the evidence the court held:

> We have in the case at bar 1) arson unquestionably; 2) ample motive; and 3) unexplained surrounding, inculpating circumstances which are relatively strong.

*Id.* at 29. Those circumstances included keeping insured merchandise on the premises when it would ordinarily have been loaded on a truck; claiming that the key to the premises had been locked inside and going to the insured's home with some other people to look for another key, notwithstanding the fact that the insured knew he did not have a second key; and a mysterious phone call made by the insured an hour before the fire. It was not claimed that the insured had set the fire himself. Instead, it was a "professional torch job".

In *Gregory's Continental Coiffures & Boutique, Inc. v. St. Paul Fire & Marine Insurance Company*, 536 F.2d 1187 (7th Cir.1976), the additional circumstance was evidence that the insured had purchased drums like those used to perpetrate the arson. While in *Lockamy v. United States Fidelity and Guaranty Company*, 652 F.2d 753 (8th Cir.1981), after stating that it was a somewhat closer question whether the evidence showed that the fire was started by or at the direction of the insured, than whether it was an incendiary fire, the court noted that the insured two months before the fire had taken out a new fire insurance policy for an amount substantially greater than previous policies and that she had moved many of her appliances and belongings out of the home shortly before the fire.[1]

As stated in the court's opinion, the district judge in *Goodwin v. Maryland Casualty Company*, 233 F.Supp. 81, 83 (E.D. Okla.1964), states that "motive plus the incendiary origin of the fire, would, in the absence of believable rebuttal evidence, be sufficient to sustain the affirmative defense [of arson]." However, the statement is made in the context of the trial judge's opinion in a non-jury case in which he held that the defense of arson had not been established.

The fact that there were two fires in the instant case comes the closest to an additional circumstance beyond motive and an incendiary fire which would permit a finding of arson by the insureds. I would agree that they are unusual circumstances. But they do not tend to prove that the Arms had the opportunity to set the fires or that they acted in a way which indicates they were attempting to defraud the insurance company.

I would affirm the judgment of the District Court.

---

1. The fact that the Arms' insurance coverage was to terminate in a few days is not the equivalent of securing excessive insurance. The Arms had reported to State Farm that the home was vacant and the insurance was being terminated for that reason. Insurance for vacant property, if available at all, was very expensive. Thus the imminent termination of insurance is a consequence of events rather than a suspicious act of the insureds.