787 F.2d 590
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MICHAEL JACOBS, a minor by his natural friends and natural
guardians, DONALD JACOBS and DELORES JACOBS, et
al., Plaintiffs-Appellants,
vs.
AMERICAN MOTORS CORPORATION, JEEP CORPORATION, AMERICAN
MOTORS SALES CORPORATION, JEEP DIVISION,
Defendants-Appellees.
 85-5234
 United States Court of Appeals, Sixth Circuit.
 3/13/86
 
 AFFIRMED
 E.D.Tenn.
 On Appeal from the United States District Court for the Eastern District of Tennessee
 Before: KRUPANSKY and GUY, Circuit Judges, and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiffs (Jacobs) appeal from the granting of a directed verdict at the close of plaintiffs' proofs in this products liability diversity action. On a motion for directed verdict, a district court in the exercise of diversity jurisdiction applies the standard for review used by the courts of the state whose substantive law governs the action. We review the granting of a directed verdict by the application of the same standard. Arms v. State Farm Fire & Cas. Co., 731 F.2d 1245, 1248 (6th Cir. 1984). The law of Tennessee requires that a trial court, faced with a motion for a directed verdict, must
 
 
 2
 take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusion to be draw[n] from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion. Holmes v. Wilson, 551 S.W.2d 682, 685 (Tenn. 1977). See also Sauls v. Evans, 635 S.W.2d 377, 379 (Tenn. 1982); Crosslin v. Alsup, 594 S.W.2d 379, 380 (Tenn. 1980).
 
 
 3
 Applying this standard to the record in the case at bar, we conclude that the trial court was correct in granting a directed verdict in favor of defendants, and we affirm.
 
 I.
 
 4
 On April 10, 1983, 15 year old Michael Jacobs and three friends were travelling on Panther Springs Road in Hamblen County, Tennessee, when the jeep Jacobs was driving rounded a curve, left the road, and struck a tree. Due to his faculties being impaired by alcohol at the time of the accident and due to impairments suffered as a result of the accident, Jacobs was unable to furnish any details of significance relative to the accident. His three companions were also unable to supply any details about the accident, except one of them, Brad Sheridan, who was able to confirm that the jeep rounded a curve, left the road, and struck a tree.[1] Since the jeep occupants were unable to furnish further information about the accident, this void was filled at trial by two sources: Captain Blaine Hartsell of the Hamblen County Sheriff's Department, and John Noettl, a vehicle and highway safety expert who testified for the plaintiffs.
 
 
 5
 Plaintiffs went to trial on the theory that the jeep, manufactured and sold by defendants and driven by young Jacobs, had a design defect--a tendency to roll over at speeds as low as 20 miles per hour, and that that defect was a proximate cause of Jacobs' accident. For purposes of the directed verdict motion, it was conceded that plaintiffs had put in enough evidence to get to a jury on design defect, and the issue on which the motion turned was whether this design defect was a proximate cause of Jacobs' injuries.[2]
 
 II.
 
 6
 Although the trial judge granted the directed verdict accompanied by only brief oral comment from the bench (App. 93-94), it is clear that the basis of his decision was that although plaintiff's expert had testified that these jeeps had a propensity to roll over and could have rolled over under these circumstances, he could not support this theory with any physical evidence that the jeep had rolled over. On the other hand, the investigating police officer, based on a physical investigation of the scene, testified that right after the accident he was able to observe rolling tire marks from all four wheels of the jeep leading from the edge of the pavement all the way to the tree (App. 21). If the record supports this finding, then clearly the trial judge was correct, since, on the issue of proximate cause, the question is n t what the vehicle might have done due to its inherent design defect but, rather, what actually occurred if that can be ascertained. An examination of the trial record reveals the following relative to Noettl's and Hartsell's testimony.
 
 
 7
 Since the plaintiffs had to establish a design defect through Noettl, the bulk of his testimony concerned his opinions relative to the design of the jeep CJ-5 and his conclusion that the design was defective primarily due to a high center of gravity. Noettl also opined that the design was a direct cause of the accident. Specifically on this point he testified:
 
 
 8
 Should, for any reason, the vehicle, if it made some maneuvers prior to this point, in which the police report shows the vehicle leaving the road, it would be my opinion that the, if the vehicle got off on the shoulder and left steering was put into the vehicle, and that is sharp left steering, to get back onto this narrow road, that you'd have immediate wheel lift-up and you would proceed in this manner down to the resting place of the vehicle against the tree. And it's my opinion, from looking at the damage to the vehicle, the scene reports, that the tree actually kept the vehicle from continuing its roll mode.
 
 
 9
 (App. 76-77; emphasis added.)
 
 
 10
 A literal reading of the above makes it clear that Noettl was testifying to what could have occurred if certain things happened. However, the cross-examination of Noettl makes it clear that he had no idea whether these things occurred.
 
 
 11
 Q. I'm going to limit my questions not to why you think the jeep is defective, not to why you think there's something wrong with the jeep, but, I'm going to limit my questions to what physical facts do you have in this case that supports your opinion that this jeep traveled in the manner that you've just described to the jury, okay, sir?
 
 
 12
 A. Yes.
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 Q. Then it was sometime between August of '84 and December of '84 when you formed your opinion that you've expressed to the jury in this case, is that correct, sir?
 
 
 16
 A. Yes.
 
 
 17
 Q. Okay. Now, at that time that you reconstructed this accident and developed your opinion which you have just given to the jury today in this case, had you calculated the speed of the jeep?
 
 
 18
 A. No, I did not calculate the speed of the jeep.
 
 
 19
 Q. Okay. Number two, did you know whether the jeep had ever gone into the left lane of traffic prior to this accident?
 
 
 20
 A. No, not, I don't know that for sure, whether it went into the left lane or not.
 
 
 21
 Q. Okay. If it went into the left lane, you didn't know how long it stayed in the left lane?
 
 
 22
 A. That's correct.
 
 
 23
 Q. If it stayed in the left lane and went back to the right lane, you don't know how long it traveled to get back to the right lane?
 
 
 24
 A. That's correct.
 
 
 25
 Q. If it stayed in the right lane, you don't know for how long it had been in the right lane before it went off onto the shoulder of the road?
 
 
 26
 A. That is correct.
 
 
 27
 Q. You didn't know whether there were any marks on the roadway, the paved portion of the roadway?
 
 
 28
 A. That's correct.
 
 
 29
 Q. You didn't know whether there were any skid marks on the paved portion of the roadway in August of 1984 when you formed your opinion in this case?
 
 
 30
 A. That's correct.
 
 
 31
 Q. You didn't know whether there were, was any gouge marks on the roadway, or scuff marks on the roadway, skid marks on the roadway in August of 1984 when you formed your opinion?
 
 
 32
 A. Well, the police report indicates marks at about 63 feet from the tree, so that is all the information I had about marks.
 
 
 33
 Q. So then you didn't know the existence of any gouge marks, tire marks, skid marks, or any other kind of marks with regard to the pavement, when you made up your mind about how this accident took place in August of 1984, is that correct, sir?
 
 
 34
 A. That is correct.
 
 
 35
 Q. Nor did you know of any marks that were on the shoulder of the road; skid marks, tire marks, scuff marks, any other kind of marks, when you made up your opinion in 1984?
 
 
 36
 A. That is correct. There was no evidence of that.
 
 
 37
 Q. Nor did you know of any skid marks, gouge marks, tire marks, any kind of marks on the embankment until the vehicle struck the tree, when you made up your opinion in August of 1984, is that correct, sir?
 
 
 38
 A. Yes.
 
 
 39
 * * *
 
 
 40
 * * *
 
 
 41
 Q. (BY MR. WOOLF) You did not know the lateral acceleration of the curve, did you, the lateral acceleration that the jeep or any vehicle would be subjected to as it came around the curve, did you?
 
 
 42
 A. I may have calculated that. It isn't the curve; you have to consider the vehicle and a speed.
 
 
 43
 Q. That's right, and since you didn't know the speed you couldn't calculate the lateral acceleration, could you?
 
 
 44
 * * *
 
 
 45
 * * *
 
 
 46
 A. Not the lateral accelerations, no.
 
 
 47
 Q. Okay. And the lateral acceleration tells you whether or not it exceeds or doesn't exceed the rollover threshold of any vehicle, doesn't it?
 
 
 48
 A. I don't understand your question.
 
 
 49
 Q. You have to get the lateral acceleration of a vehicle above its rollover threshold before anything can happen to that vehicle, whether it's a jeep, or passenger car, or truck?
 
 
 50
 A. You have to get the forces that are acting laterally through the jeep to equal the friction forces that the wheels are experiencing, and that has to be at a level that the vehicle will roll over.
 
 
 51
 Q. And you did not do that at the time you made up your opinion in this case?
 
 
 52
 A. No.
 
 
 53
 * * *
 
 
 54
 * * *
 
 
 55
 Q. All right. Then I asked you in your Deposition, 'Did you believe that the left side wheels were off the ground?'
 
 
 56
 A. Yes.
 
 
 57
 Q. And you said, yes, you did?
 
 
 58
 A. Yes.
 
 
 59
 Q. All right, and I asked you, 'Were the left wheels off the ground high enough to make the jeep roll over on its side prior to impact?' And you said you didn't know?
 
 
 60
 A. That's correct.
 
 
 61
 Q. And then I asked you, 'How high off the ground were the left wheels,' just like I did this morning, and you said you didn't know?
 
 
 62
 A. That's correct.
 
 
 63
 Q. Then I asked you, 'Since you're using the damage to the jeep to tell me that the wheels were off the ground; that is, the left wheels were off the ground, how far back from the tree would the wheels have had to come off the ground in order to cause that damage.' Are you with me, sir?
 
 
 64
 A. Yes.
 
 
 65
 Q. And I asked you, 'Would that be a hundred feet away from the tree?' And you said no, is that correct?
 
 
 66
 A. I don't know if I said no or 'I don't know.' I can't remember.
 
 
 67
 Q. Well, you said no, but let's make sure so that we don't get in any argument.
 
 
 68
 A. Okay. I understand. I remember I said no when you asked it that way, right.
 
 
 69
 Q. Okay, and then I said, 'Would it have occurred 80 feet from the tree?' And you, again, said no, correct, sir?
 
 
 70
 A. That's correct.
 
 
 71
 Q. And then I asked you, 'Would it have occurred 64 feet from the tree?' And you said no, correct, sir?
 
 
 72
 A. That's correct.
 
 
 73
 Q. And then I asked you whether it would have occurred 60 feet from the tree, and you said 'I don't know', correct, sir?
 
 
 74
 A. That's correct.
 
 
 75
 Q. Then I asked you whether it would have occurred 50 feet from the tree, and you said, 'I don't know'?
 
 
 76
 A. That's correct.
 
 
 77
 Q. And then I asked you whether it would have occurred 40 feet from the tree, and you said, 'I don't know'?
 
 
 78
 A. That's correct.
 
 
 79
 Q. And then I asked you if it could have occurred more or less than 40 feet from the tree, and your answer, again, was 'I don't know.'
 
 
 80
 A. That's right.
 
 
 81
 * * *
 
 
 82
 * * *
 
 
 83
 Q. At the time I took your Deposition and you had already formed your opinion in this case, I asked you whether or not you knew what the driver of the vehicle was doing at the time of the accident, and you told me, 'I don't know'?
 
 
 84
 A. I don't know precisely what he was doing, yes.
 
 
 85
 Q. You told me you didn't know whether he was drunk or sober?
 
 
 86
 A. That's correct.
 
 
 87
 Q. You told me you didn't know whether he was looking or not looking?
 
 
 88
 A. That's correct.
 
 
 89
 Q. So you made up your mind that the jeep in this case got up on its right wheels as it was just going off the pavement of the road, and you didn't have any idea as to what the operator of this jeep was doing at the time, is that correct, sir?
 
 
 90
 A. Other than he was driving the jeep or attempting to steer.
 
 
 91
 Q. Other than he was driving the jeep?
 
 
 92
 A. Yes.
 
 
 93
 Q. Other than he was sitting in the driver's side of the jeep?
 
 
 94
 A. That's correct.
 
 
 95
 Q. If he attempted to steer, how much he turned the steering wheel right or left on the roadway, you don't know?
 
 
 96
 A. That's correct.
 
 
 97
 Q. You don't know how much he turned the steering wheel right or left on the roadway at any time from the time he left wherever he started out with that night to the time that it impacted the tree, is that correct?
 
 
 98
 A. That's correct, you don't know how much he turned the steering wheel.
 
 
 99
 (App. 81, 82-84, 84-85, 85-86, 88-89, 91-92)
 
 
 100
 In contrast to this testimony was the testimony of Officer Hartsell which included the following:
 
 
 101
 Q. As I understand what you are saying, there were tire marks on the left side tires, and tire marks on the right-side tires that left the edge of the payment directly, directly to where the jeep ended up against a tree?
 
 
 102
 A. Yes, sir.
 
 
 103
 Q. Is that correct?
 
 
 104
 A. Yes.
 
 
 105
 * * *
 
 
 106
 * * *
 
 
 107
 Q. You mentioned, I believe, that these were rolling tire marks as distinguished from skid marks?
 
 
 108
 A. Yes.
 
 
 109
 Q. You mean that the tires appeared to actually, as though the vehicle drove down that embankment and into the tree without hitting the brakes or anything of that nature?
 
 
 110
 A. Yes.
 
 
 111
 * * *
 
 
 112
 * * *
 
 
 113
 Q. Did you see any skid marks, or tire marks, or gouges, or scrape marks, or anything of that nature on the paved portion of the roadway?
 
 
 114
 A. No, sir.
 
 
 115
 * * *
 
 
 116
 * * *
 
 
 117
 Q. When you examined, I think they call it the burm of the road, the shoulder of the road, the part of the gravel and dirt right next to the pavement, is what you found the tire marks from the jeep?
 
 
 118
 A. Yes, sir. They left directly from the roadway to the rear tires of the jeep.
 
 
 119
 Q. Straight across the shoulder of the road?
 
 
 120
 A. Yes, sir.
 
 
 121
 Q. Down the embankment to the rear of the jeep?
 
 
 122
 A. Yes, sir.
 
 
 123
 * * *
 
 
 124
 * * *
 
 
 125
 Q. Is that because you found no evidence that this jeep had ever rolled over at any time prior to the striking of the tree?
 
 
 126
 A. Yes, sir.
 
 
 127
 Q. I take it from what you've told us here today is that your examination of the scene of the accident revealed that the jeep was traveling north in the right-hand lane of traffic, is that correct?
 
 
 128
 A. Yes, sir.
 
 
 129
 * * *
 
 
 130
 * * *
 
 
 131
 Q. And that when the road turned to the left the jeep went off the shoulder of the road, down the embankment, and into the tree, is that correct?
 
 
 132
 A. Yes, sir.
 
 
 133
 * * *
 
 
 134
 * * *
 
 
 135
 Q. Lost control at A, which you said in your report, and I believe what you told the jury, is that the car went off onto the shoulder of the road after which the young man lost control, is that correct?
 
 
 136
 A. Point A is where he went off the road to start with.
 
 
 137
 Q. So this, then, if I may, these marks are off the pavement and on the shoulder of the road?
 
 
 138
 A. Yes, sir.
 
 
 139
 Q. And it was after the vehicle left the pavement that you have put in your report that it lost control?
 
 
 140
 A. Yes.
 
 
 141
 (App. 21, 21-22, 22, 23, 28)
 
 
 142
 Noettl's conclusion was predicated on a classic false syllogism: A design defect in jeeps can result in roll over and cause an accident; this jeep was in an accident; therefore, this jeep rolled over.[3] Noettl simply concluded from the propensity of jeep CJ-5s to roll over that this jeep's wheels left the ground. There is, however, no support for this conclusion other than conjecture. A jury cannot be allowed to indulge in sheer speculation as to what caused an accident. Plaintiffs failed to make a prima facie case and the judge correctly refused to allow this case to go to the jury.[4]
 
 
 
 [1]
 Plaintiff contends that Sheridan's testimony that the vehicle left the road should be interpreted to mean that one side of the jeep's wheels left the road. The record simply does not support this construction
 
 
 [2]
 The design defect need not be the proximate cause of the accident; it need only be a contributing cause. There is no doubt from the record that one of the causes of the accident was Jacobs' intoxication and the fact that he was not looking at the road when the jeep missed the curve. Jacobs has a state court damage action against a liquor establishment and two private individuals for furnishing Jacobs with alcohol, which he claims impaired his faculties and caused this accident
 
 
 [3]
 Although there is considerable discussion of roll over in the record, Noettl did not actually claim the jeep rolled over but, rather, that its left wheels left the ground
 
 
 [4]
 In support of his argument on appeal, plaintiffs also reference Judge Hull's comments to the jury when he was excusing them after directing a verdict, it being plaintiffs' contention that the remarks indicated some uncertainty on the part of Judge Hull. It is obvious that these remarks were not intended to be other than a simplified explanation to the jury in lay terms which would explain to them why they were excused from further service