USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1094

 FERRARA & DIMERCURIO, INC.,

 Plaintiff, Appellee,

 v.

 ST. PAUL MERCURY INSURANCE CO.,

 Defendant, Appellant.

No. 98-1095

 FERRARA & DIMERCURIO, INC.,

 Plaintiff, Appellant,

 v.

 ST. PAUL MERCURY INSURANCE CO.,

 Defendant, Appellee.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. W. Arthur Garrity, Jr., Senior U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Coffin and Campbell, Senior Circuit Judges.
 
 

 Richard H. Pettingell, with whom Davis, White & Pettingell,
LLC, Anthony R. Zelle and Zelle & Larson were on brief for St. Paul
Mercury Insurance Co.
 Joseph M. Orlando, with whom David S. Smith, Vita A. Palazzoloand Orlando and Associates, were on brief for Ferrara & DiMercurio,
Inc.

March 4, 1999

 CAMPBELL, Senior Circuit Judge. The commercial
fishing vessel F/V TWO FRIENDS was destroyed by fire on July 3,
1993, while berthed in Gloucester, Massachusetts. Ferrara &
DiMercurio, Inc. ("F&D"), the owner of the vessel, sought to
recover insurance under a Hull policy issued by St. Paul Mercury
Insurance Company ("St. Paul"). St. Paul refused to pay, on the
alternative grounds that either a third party had burned the
vessel, an event that, in St. Paul's view, was expressly excluded
from policy coverage, or else F&D had committed fraud by
intentionally burning its own vessel. F&D brought this action in
the district court, under the diversity jurisdiction, claiming that
St. Paul's refusal to pay was a breach of the insurance contract
and constituted "bad faith" in violation of Massachusetts consumer
protection laws (Mass. Gen. Laws ch. 93A). Prior to trial, the
district court ruled that the Hull policy covered losses caused by
fires intentionally set by third parties. After St. Paul presented
its arson-by-the-insured defense at trial, the district court
granted judgment as a matter of law for F&D. The Chapter 93A claim
was subsequently dismissed on summary judgment. 
 On appeal, St. Paul contends that the district court
erred in ruling that losses caused by fires intentionally set by
third parties are covered under the Hull policy. St. Paul also
appeals from the district court's grant of F&D's motion for
judgment as a matter of law. F&D cross-appeals from the district
court's grant of St. Paul's motion for summary judgment on F&D's 
Chapter 93A claim. For the reasons that follow, we reverse the
district court's ruling that the Hull policy covers losses caused
by third-party arson and reverse the directed verdict granted in
favor of F&D. We affirm the dismissal of the Chapter 93A claim.
 I. BACKGROUND
 F&D was a closely-held, family corporation engaged in the
commercial fishing trade. The corporation had four officers: 
Leonardo Ferrara, Sr., Vito Ferrara, Ambrose Ferrara, and Francesco
DiMercurio. Six individuals, all family members, owned shares in
the company: Leonardo Ferrara, Sr., Vito Ferrara, Ambrose Ferrara,
Francesco DiMercurio, Vincenza Ferrara, and Enza DiMercurio. 
 In 1987, F&D purchased the commercial fishing vessel F/V
TWO FRIENDS for $375,000 with the proceeds of a loan from the
Gloucester Bank & Trust Company. As a condition of the loan,
members of the Ferrara family agreed to act as personal guarantors
of F&D's note. In addition, Vincenza Ferrara and Francesco
DiMercurio pledged their homes as additional security. The TWO
FRIENDS was the sole physical asset owned by F&D. It was insured
for $350,000 under a Marine Hull and Machinery policy issued to F&D
in 1992 by St. Paul. The Hull policy that was issued by St. Paul
was an American Institute AHAB Form policy, revised as of July 1,
1962. The TWO FRIENDS was also insured for $350,000 under a War
Risk policy issued to F&D by Underwriters at Lloyd's, London.
 At trial, James Carey, St. Paul's accounting and
financial expert, testified that F&D had operated at a loss from
the moment of its formation. Carey testified that F&D had
considerable difficulty in making timely loan payments to
Gloucester Bank & Trust Company. Because F&D was habitually late
in making its payments, the bank made demand in July, 1991, for
payment in full of the outstanding loan, an amount in excess of
$290,000. In November 1991, the bank made demand upon the personal
guarantors of F&D's note for payment in full of the outstanding
loan. Also in November 1991, the bank filed a lawsuit to foreclose
on the residence of Vincenza Ferrara. After a period of
negotiation, the bank, F&D, and the personal guarantors reached an
agreement in January 1992, whereby the bank would forebear from
proceeding to judgment in the foreclosure action so long as $15,000
was paid to the bank and monthly payments were kept current
thereafter. 
 After the January 1992 agreement, Carey testified that
F&D continued to have difficulty making timely payments to the
bank. At a meeting in April 1993, F&D and representatives of
Gloucester Bank & Trust Company agreed that F&D would attempt to
sell the TWO FRIENDS for $225,000. On April 15, 1993, F&D entered
into an exclusive brokerage agreement with Ahern Marine Agency,
Inc. in an effort to sell the TWO FRIENDS. 
 On July 2, 1993, the TWO FRIENDS returned to Gloucester
from a five-day fishing trip with Leo Ferrara, Jr. and three crew
members aboard. Leo Ferrara, Jr., the ship's engineer, testified
that he left the TWO FRIENDS at approximately 4:30 p.m., and that
he was the last crew member to leave the vessel. He further
testified that prior to leaving the vessel, he had locked all of
the doors both upstairs and downstairs. He testified that the only
way to gain access to the TWO FRIENDS once these doors were locked
was through the door on the crew quarters level, which he had
secured with a padlock. 
 On July 3, 1993, at approximately 2:30 a.m., the TWO
FRIENDS caught fire while tied to her berth at the Frontiero
Brothers, Inc. wharf. When the Gloucester Fire Department arrived, 
firefighters discovered that the only door through which they could
gain entry to the TWO FRIENDS was located on the crew quarters
level and was padlocked. The firefighters cut the padlock in order
to enter. The Gloucester Fire Department's preliminary report,
which was prepared on July 4, 1993, indicated that the cause of the
fire was electrical in nature, but the origin uncertain. 
 Leo Ferrara, Jr. and Vito Ferrara both testified that at
the time of the fire, there were only four keys to the padlock used
to secure the door on the crew quarters level. One of the keys was
in the possession of Leonardo Ferrara, Sr., the president of F&D,
one was in the possession of his son, Vito Ferrara, the vice-
president of the corporation, one was in the possession of Leo
Ferrara, Jr., and the final key was hanging, along with the keys to
other vessels, inside a warehouse on the Frontiero Brothers, Inc.
wharf. Pasquale Frontiero, the owner of the wharf, testified that
on the night of the fire he had locked the warehouse prior to going
home for the evening. He testified that a few days after the fire,
he noticed that the key to the TWO FRIENDS was still hanging in its
usual location inside the warehouse.
 After receiving notification of the fire aboard the TWO
FRIENDS, St. Paul retained Fred O'Donnell, a fire scene analyst,
and John Malcolm, a forensic electrical fire consultant, to
investigate the cause and origin of the fire. O'Donnell and
Malcolm first visited the fire scene on July 8, 1993. They were
accompanied by David DuBois, a marine surveyor who had also been
retained by St. Paul. On this initial visit, Malcolm, DuBois, and
O'Donnell conducted a visual inspection of the TWO FRIENDS and
O'Donnell took samples from the crew quarters and galley areas to
determine whether an accelerant was present. 
 Malcolm and O'Donnell returned to the vessel on August 3,
1993, to obtain the electrical panels, ostensibly for inspection
and possible subrogation claims. At the request of counsel for St.
Paul, but without obtaining authorization from F&D, O'Donnell and
Malcolm removed the electrical panels from the TWO FRIENDS. The
panels were placed in an evidence storage locker at Malcolm's
laboratory and were provided to counsel for F&D upon his request. 
 O'Donnell testified that based upon his examination of
burn patterns, he was able to identify points of origin for at
least three, and possibly four, separate fires aboard the TWO
FRIENDS. He testified that one point of origin was located
adjacent to a bunk in the port side crew quarters bunkroom, and
another point of origin was located one deck below the crew
quarters in the engine room at an electrical panel on the forward
starboard side bulkhead. O'Donnell testified that a third point of
origin was also located in the engine room, on the port side next
to the main hydraulic tank. Finally, O'Donnell testified that
there was an area of "heavy burn" in the galley area. 
 O'Donnell testified that two of the three samples he had
taken from the crew's quarters contained traces of diesel fuel, but
that none of the samples taken from the galley area contained
evidence of an accelerant. He further testified that, in his
opinion, the fire on the port side of the engine room was set by
someone placing a container filled with accelerant in the forward
port corner of the engine room next to the hydraulic tank hoses. 
 Malcolm investigated the vessel's electrical system to
determine whether it played any part in the fire. He testified
that based upon his interview of Leo Ferrara, Jr. on July 8, 1993,
it did not appear that the TWO FRIENDS had experienced any
electrical difficulties on the July 2, 1993 fishing trip. Malcolm
testified that he found no evidence that the electrical system had
played any role in the fires in the bunkroom or in the fire that
originated in the engine room on the port side. He testified,
however, that he did find evidence of the escape of electricity, 
or "arcing," in the electrical panel on the forward starboard side
bulkhead in the engine room. Malcolm testified that, based upon
his examination of the vessel's electrical system, it was his
opinion that the fire in the electrical panel in the engine room
was the first fire to ignite on July 3, 1993. Malcolm also
concluded in his written report, drafted on July 22, 1993, and
testified at trial that the burn patterns in the area of the
electrical panel were consistent with an accidental electrical
fire. He specifically noted in his report and testified that it
was possible for persons to intentionally set up the burning of an
electrical panel to make the fire appear accidental, but that he
had discovered no electrical evidence that this had occurred.
 O'Donnell and Malcolm both testified that there was no 
evidence of "communication," or connection, between either of the
two fires in the engine room and the fires in the crew quarters or
between the two fires in the engine room. Based upon the arcing in
the engine room electrical panel and the absence of arcing
elsewhere in the ship's electrical system, Malcolm concluded that
the fire in the crew quarters could not have ignited the fire in
the electrical panel in the engine room. Malcolm and O'Donnell
both concluded that the fire at the electrical panel was not the
source of the fire in the crew quarters, as there was no evidence
that the electrical panel fire had spread upward from the panel. 
Based upon his examination of the burn patterns on the engine room
floor boards, O'Donnell concluded that the fire in the electrical
panel on the starboard side of the engine room did not cause the
fire on the port side of the engine room next to the hydraulic
tank. Given the absence of evidence of communication among the
various fires originating at different locations on the vessel, as
well as the evidence that an accelerant was present in the crew
quarters and on the port side of the engine room, O'Donnell
testified that, in his opinion, the fires aboard the TWO FRIENDS
had been deliberately set by someone.
 Carey, the accounting expert, testified that at the time
of the fire, F&D owed a total of $426,000 to various creditors. He
further testified that to meet its financial obligations at the
time of the fire, F&D would have had to generate revenues from its
fishing operation of approximately $380,000 per year. Carey
testified that F&D had never been that profitable in all its years
of operation. Carey also testified that had the July 3, 1993 fire
aboard the TWO FRIENDS resulted in a total loss of the vessel, and
had St. Paul paid the full proceeds of the Hull policy, F&D would
have gained $350,000 to be applied to its debts. Carey stated that
as a loss payee under the policy, the Gloucester Bank & Trust
Company would have had its note paid in full, and that this payment
would have extinguished the personal liability of the guarantors of
the note and avoided the loss of the personal guarantors' homes. 
By contrast, Carey testified that had the vessel been sold for
$225,000, the bank loans would not have been paid in full, the
personal liability of the guarantors would not have been
extinguished, and the homes of the personal guarantors would have
remained in jeopardy.
 Before trial, St. Paul requested a ruling of law that 
losses caused by arson committed by a party other than the insured
were not covered under the Hull policy. The "Perils" clause of the
Hull policy under which the TWO FRIENDS was insured listed "Fire"
as a covered peril. St. Paul argued, however, that only fires
that are "fortuitous" and "of the Sea" are covered under the Perils
clause, and that the fire in this case met neither requirement. 
St. Paul argued, in the alternative, that the Strikes, Riots, and
Civil Commotions("SR&CC") clause excluded arson by third parties
from coverage under the Hull policy. The SR&CC clause stated: 
"Warranted free of loss, damage or expense in consequence of
strikes, lockouts, political or labor disturbances, civil
commotion, riots, martial law, military or usurped power or
malicious acts." (emphasis supplied). The district court ruled
that all fires, with the exception of those intentionally set by
the insured, were insured under the Perils clause. The court
further ruled that although arson by a third party was a "malicious
act," the SR&CC clause did not exclude from coverage losses caused
by fires intentionally set by third parties unless the arson was
somehow "connected with" a strike, lockout, political or labor
disturbance, riot, or some other event set forth in the SR&CC
clause. As the arson alleged by St. Paul did not fit within any of
these categories, the district court ruled that the Hull policy
provided coverage for losses caused as a result of the burning of
the TWO FRIENDS by a third party.
 Denied the opportunity to defend on the further ground
that the vessel had been intentionally burned by unknown third
parties, St. Paul concentrated at trial on the defense of arson-by-
the-insured. In order to prevail on this defense, Massachusetts
law required that St. Paul prove, by a preponderance of the
evidence, that (1) the fire was incendiary in nature; (2) F&D had
a motive to set the fire; and (3) F&D or its agents had an
opportunity to set the fire. See infra. St. Paul presented the
evidence recounted above, including its experts' opinions that
multiple fires were deliberately set aboard the TWO FRIENDS, the
evidence concerning the financial difficulties encountered by F&D
prior to the fire, and the limited availability of keys to the 
locked vessel. 
 After St. Paul presented its arson defense, F&D moved
for judgment as a matter of law. The district court denied the
motion and ruled that whether St. Paul had proved its arson defense
was "a question for the jury." However, shortly after F&D had
begun to put on its rebuttal case, the district court reconsidered
its prior ruling and directed a verdict in favor of F&D. While the
court considered it "a very close question," it concluded that the
circumstantial evidence presented by St. Paul was not sufficient to
allow a jury to return a verdict in its favor. 
 Thereafter, the court allowed the parties to undertake
additional discovery on F&D's claim that St. Paul's refusal to
settle under the Hull policy constituted an unfair or deceptive
business practice under Mass. Gen. Laws ch. 93A. During this
additional discovery period, St. Paul produced, for the first time, 
a report that had been prepared by its marine surveyor, David
DuBois, on July 9, 1993, in which DuBois concurred with the
preliminary conclusion of the Gloucester Fire Department that the
fire on July 3, 1993, was electrical in nature. The parties filed
cross-motions for summary judgment on F&D's Chapter 93A claim. The
district court granted summary judgment in favor of St. Paul. 
 II. ANALYSIS
 The parties have filed cross-appeals challenging the
rulings of the district court. For the reasons that follow, we
conclude that the district court erred in ruling that losses caused
by fires intentionally set by third parties were not excluded by
the SR&CC clause from coverage under the Hull policy. We reverse
the directed verdict granted in favor of F&D on the breach of
contract claim, but affirm the district court's grant of summary
judgment in favor of St. Paul on the Chapter 93A claim.
A. Arson By Third Parties
 We review de novo the district court's interpretation of
the St. Paul Hull insurance policy. See St. Paul Fire and Marine
Ins. Co. v. Warwick Dyeing Corp., 26 F.3d 1195, 1199 (1st Cir.
1994). We are guided by several familiar rules of construction. 
In examining the language of the policy, we consider "what an
objectively reasonable insured, reading the relevant policy
language, would expect to be covered." Trustees of Tufts Univ. v.
Commercial Union Ins. Co., 415 Mass. 844, 849 (1993) (quoting Hazen
Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689,
700 (1990)). Absent ambiguity, we give policy language its plain
and ordinary meaning. See Cody v. Connecticut Gen. Life Ins. Co.,
387 Mass. 142, 146 (1982). Any ambiguity is resolved against the
insurer, who drafted the policy, and in favor of the insured. 
Thus, "if there are two rational interpretations of policy
language, the insured is entitled to the benefit of the one that is
more favorable to it." Hazen, 407 Mass. at 700. The insured bears
the burden of proving that a claim falls within the grant of
coverage, which, once established, shifts the burden to the insurer
to show the applicability of any exclusion. Camp Dresser & McKee,
Inc. v. Home Ins. Co., 30 Mass. App. Ct. 318, 321 (1991).
 St. Paul asserts that the fire aboard the TWO FRIENDS, 
if deliberately set by a third party, was not covered under the
Perils clause of the Hull policy because it was not "of the seas"
or "fortuitous." See G. Gilmore & C. Black, The Law of Admiralty,
 2-9, p. 72 (2d ed. 1975) (perils "of the sea" are "fortuitous
losses occurring through extraordinary action of the elements at
sea, or any accident or mishap in navigation"). St. Paul misreads
the Perils clause. See n. 6, supra. "Fire" is specified as a
covered peril in itself, separate and apart from the perils "of the
sea." See Rosa v. Insurance Co. of the State of Pennsylvania, 421
F.2d 390, 392 (9th Cir. 1970) (interpreting nearly identical perils
clause to provide coverage for electrical fire). St. Paul's 
interpretation of the Perils clause would result in a denial of
coverage even if the fire aboard the TWO FRIENDS were found to be
entirely accidental in nature, since the fire would not have
resulted from the elements at sea or navigational accident, and,
thus, would not be "of the seas." That is not a rational
construction of the Perils clause. Indeed, St. Paul consistently
disavowed such an interpretation below, contending instead that
coverage was not available under the Hull policy because the loss
had been caused by the intentional burning of the vessel. 
 St. Paul's focus on the Perils clause is misplaced, as 
F&D carried its burden of proving that accidental fires fall within
the grant of coverage under the Perils clause. The burden shifted
to St. Paul to demonstrate that a fire set deliberately by a third
party was, as the Perils clause states, "excluded by provisions
elsewhere in the Policy or by endorsement." St. Paul asserts that
the SR&CC clause, which excludes from coverage "loss, damage or
expense in consequence of strikes, lockouts, political or labor
disturbances, civil commotion, riots, martial law, military or
usurped power or malicious acts," excludes losses caused by third-
party arson. The district court, however, construed the SR&CC
clause narrowly as excluding only losses caused by malicious acts
that are performed within the context of "strikes, lockouts,
political or labor disturbances, civil commotion, riots, martial
law, military or usurped power." 
 F&D concedes that arson by a third party constitutes a
"malicious act." F&D urges us, however, to affirm the district
court's constricted reading of the SR&CC clause. Like the district
court, we have found little guidance in the case law as to the
proper construction of the language at issue. The parties rely
primarily upon the decision of the district court in O'Donnell-Usen
Fisheries v. Bathurst, 664 F. Supp. 37 (D. Mass. 1987). In
Bathurst, the F/V Ann C. Spencer was destroyed by fire. A party
unrelated to the insured was charged with arson of the vessel, but
later acquitted. The insurer argued that arson by a third party
was not covered by the insurance policy. The district court
examined in some detail the interplay between marine Hull policies,
such as the one at issue here, and War Risk policies. The latter,
as the court pointed out, provide coverage for those risks
precluded from coverage under Hull clauses. In Bathurst, the
insured, unlike F&D, did not have a Hull policy. Nevertheless, the
district court read the applicable War Risk policy to provide
coverage for only those risks that a Hull policy would have covered
but for the preclusion from coverage under its War, Strikes and
Related Exclusions ("WSRE") clause. The court utilized the WSRE
clause from the 1970 version of the American Institute Hull Clauses
("AIHC") form, which excluded from coverage any losses caused by,
inter alia, "malicious acts or vandalism." The insured conceded
that arson was a "malicious act or vandalism." Thus, the court
concluded that "when malicious acts or vandalism occur in the form
of arson the loss is precluded from coverage by the [WRSE clause]." 
Id. at 41. Since the WRSE clause of the Hull policy excluded
coverage for losses caused by arson perpetrated by a third party,
the court held that the War Risk policy provided coverage for such
losses. See id. at 42. 
 St. Paul argues that Bathurst supports its claim that
arson by a third party is excluded under the SR&CC clause, while
F&D asserts that Bathurst is distinguishable, as the court was
interpreting a different insurance form than was used to insure the
TWO FRIENDS. The district court agreed with F&D and distinguished
Bathurst on the ground that the SR&CC clause in the St. Paul policy
was "narrower" than the WRSE clause construed by the court in
Bathurst. 
 We see no important distinction, however, between the
language used in the 1962 AHAB Form used by St. Paul and the 1970
AIHC Form construed by the district court in Bathurst. The
language used in the two policy forms is nearly identical. Both
clauses exclude coverage for losses caused by, inter alia,
"malicious acts," and both list "malicious acts" after a succession
of others of different generic types. We are, of course, not bound
by Bathurst. However, we believe that the Bathurst court's
interpretation of "malicious acts or vandalism" in the WRSE clause,
without any contextual limitation of the type found by the district
court here, was sound. 
 By contrast, we do not believe that the district court's
instant construction of the SR&CC clause was correct. "Malicious
acts" is set forth in the SR&CC clause as a separate, unmodified
exclusion from coverage. To be sure, it appears in a clause
labeled, "Strikes, Riots, and Civil Commotions," and is preceded by
other events certain of which fit generically under that label. 
But nothing in the plain language and grammar of the clause
supports the district court's constriction of excludable "malicious
acts" to only those acts perpetrated within the context of one or
more of the other co-listed events. Nor, in our view, would an
objectively reasonable insured interpret the "malicious acts"
exclusion so narrowly. Like the insured in Bathurst, F&D concedes,
as it must, that arson by a third party is a "malicious act." 
Accordingly, losses caused by third-party arson are excluded under
the SR&CC clause.
 We add that restricting "malicious acts" to only those
malicious acts that also fall under the previously-listed generic 
categories of strikes, lockouts, political or labor disturbances,
etc. would render the "malicious acts" language superfluous. For
this reason, it would be inappropriate to apply the ejusdem generiscanon of construction, under which general words following specific
ones are sometimes limited to the formers' objects. The Supreme
Court has said that the ejusdem generis canon "cannot be employed
to render general words meaningless." United States v. Alpers, 338
U.S. 680, 682 (1950). In the SR&CC clause, losses "in consequence
of strikes, lockouts, political or labor disturbances, civil
commotion, riots, martial law, military or usurped power" are
already excluded from policy coverage. That exclusion obviously
applies to malicious as well as to other acts within the described
generic categories. Hence to limit the phrase, "malicious acts,"
to just those activities related to the former categories would be
to render the "malicious acts" provision redundant, an
interpretation running counter to the customary assumption that all
the words within a clause serve some purpose. Compare Reiter v.
Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute
we are obliged to give effect, if possible, to every word Congress
used."); see also 2A J. Sutherland, Statutes and Statutory
Construction 46.06. Only by reading "malicious acts" as
including malicious actions beyond those associated with the
earlier categories does the phraseology add in a meaningful fashion
to what has already been said.
 Here, the malicious acts in question are arson and not,
as a practical matter, arson by the owner or its agents, which are
actions separately excluded from coverage by law, but the rarer
acts of fire-setting by vandals or other malicious individuals. 
Such acts fall within the general category of intentional third-
party violence which can be said to be a principal overall theme 
of the SR&CC clause. The "malicious acts" category serves the
relevant purpose of excluding destructive acts "not public or
tumultuous enough to be considered a riot or civil commotion." 
Harry L. Haehl, Jr., The Hull Policy: Coverages and Exclusions
Frequently Employed: F.C.& S., War Risk, S.R. & C.C., Automatic
Termination, Cancellation, 41 Tulane L. Rev. 277, 286 (1967). 
 In sum, the SR&CC clause unambiguously excludes from
coverage losses caused by "malicious acts," including arson,
whether or not the malicious acts occur in the context of one or
more of the other events listed in the SR&CC clause. Thus, on
remand, the jury should be permitted to determine whether the fire
on July 3, 1993 was deliberately set by third parties. Should the
jury answer that question in the affirmative, St. Paul would not be
liable under the Hull policy. 
B. St. Paul's Arson Defense 
 At trial, St. Paul proceeded on the theory that F&D had
committed insurance fraud by deliberately burning the TWO FRIENDS. 
Shortly after F&D began to present its rebuttal case, the district
court ruled from the bench that St. Paul had failed to adduce
sufficient evidence of arson by the insured to reach the jury. 
Accordingly, although the district court considered it "a very
close question," it granted F&D's motion for judgment as a matter
of law on the breach of contract claim. 
 We review de novo the district court's grant of F&D's
motion for judgment as a matter of law, viewing the evidence in the
light most favorable to St. Paul. See Brennan v. GTE Government
Sys., 150 F.3d 21, 25 (1st Cir. 1998). In order to present its
arson defense to a jury, St. Paul must provide "more than a
scintilla of evidence and may not rely on conjecture or
speculation." Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir.
1996). However, the court "must not consider the credibility of
the witnesses, resolve the conflicts in testimony, or evaluate the
weight of the evidence." Andrade v. Jamestown Housing Auth., 82
F.3d 1179, 1186 (1st Cir. 1996). "A verdict may be directed only
if, applying these standards, the evidence does not permit a
reasonable jury to find in favor of [St. Paul]." Brennan, 150 F.3d
at 26.
 St. Paul bore the burden of demonstrating at trial that
servants or agents of F&D deliberately set the fire aboard the TWO
FRIENDS. More specifically, Massachusetts law requires that a
party interposing an arson-by-the-insured defense prove the
following elements by a preponderance of the evidence: (1) that
the fire was incendiary (deliberately set); (2) that opportunity
existed for servants or agents of the insured to set the fire; and
(3) that the insured had a motive to set the fire. See, e.g.,
Osvaldo Varane, Inc. v. Liberty Mutual Insurance Co., 362 Mass.
864, 865 (1972). 
 The district court ruled that St. Paul had failed to
carry its burden as to each of the above elements and, thus, could
not reach the jury on its arson-by-the-insured defense. With
regard to motive, the district court concluded that since the
benefit of the insurance proceeds would have gone to Gloucester
Bank & Trust Company and F&D's creditors in the first instance, F&D
had no economic motive to burn the TWO FRIENDS. Indeed, the court
concluded that F&D had strong reason not to burn the TWO FRIENDS. 
The court stated: "Where was the advantage to the corporation or
to the individuals of the family who owned it, in the destruction
of their means of livelihood?" 
 With regard to opportunity, the court noted that the last
agent of F&D to be near the TWO FRIENDS was Leo Ferrara, Jr., who
left the vessel approximately 11 hours before the fire started. 
The court concluded that since St. Paul's witnesses could not place
any agent or servant of F&D near the TWO FRIENDS closer in time to
the fire, the evidence of opportunity was too weak to go to the
jury. 
 Finally, the district court rejected as untenable St.
Paul's theory of incendiarism. The court noted that both Malcolm
and O'Donnell had testified that the fire located at the electrical
panel in the engine room had ignited first. Even assuming that the
electrical panel fire had been deliberately set, the court
concluded that it "simply does not make sense" that a person would
set that fire and then proceed, at considerable danger to his own
safety, to ignite fires in other areas of the boat. Indeed, the
court described this as an "odd way to burn a boat." The "bottom
line on liability," in the court's view, was that St. Paul's
incendiarism theory required some evidence that the fire had been
pre-arranged or planned. As St. Paul did not present such
evidence, the court concluded that it was "too big a leap" for a
reasonable jury to find that F&D had deliberately burned the TWO
FRIENDS. 
 We do not disagree with the district court that the
arson-by-the-insured defense gives rise to close and difficult
factual questions. Nevertheless, after careful review of the
entire record, we conclude that the district court erred in
withdrawing the arson defense from the jury and directing a verdict
in favor of F&D. St. Paul presented sufficient circumstantial
evidence as to each of the required elements of its arson defense
to reach the jury. The circumstantial evidence of motive was
strong. While it is true that the Ferrara family would not have
pocketed the proceeds of the St. Paul policy directly, Carey
testified that a complete loss of the TWO FRIENDS would have
resulted in a payment of $350,000, a substantial portion of which
would have gone to extinguish the debt to the Gloucester Bank &
Trust Company. Carey also testified that this payment would have
saved the personal guarantors' homes, which had been pledged as
additional security to the bank. Further, there was substantial
evidence from which a reasonable jury could conclude that F&D had
never been a profitable venture, and, given its considerable debt
obligations, was in dire straits financially at the time of the
fire. This was sufficient evidence of motive to reach the jury. 
See Osvaldo, 362 Mass. at 865 (insured's business experiencing
financial difficulties, payments to mortgagees in arrears, accounts
payable far exceeded accounts receivable, and home had suffered
foreclosure). 
 The evidence with regard to opportunity was somewhat
weaker. The court found it significant that no servant or agent of
F&D had been seen near the TWO FRIENDS at or near the time of the
fire. Such direct evidence is not required to present an arson
defense to the jury. There was undisputed testimony that there
were only four keys to the TWO FRIENDS, three of which were in the
possession of agents of F&D, the other being in the possession of
the wharf owner. The evidence that access to the vessel was
limited and that the Gloucester Fire Department had to force entry
when it arrived on the scene may have led the jury, if permitted to
consider it, to find that the arsonist had a key. See Richardsonv. Travelers Fire Ins. Co., 288 Mass. 391, 396 (1934) (evidence
warranted finding that insured alone had key which would permit
person to enter house and leave it locked up as it was when firemen
arrived); see also Gregory's Continental Coiffures & Boutique, Inc.v. St. Paul Fire & Marine Ins. Co., 536 F.2d 1187, 1191 (7th Cir.
1976) (reversing directed verdict for insured where evidence that
access to premises was limited could have resulted in jury
determination that insured had procured someone to start fire and
had given individual a key).
 As said, the "bottom line" to the district court on
liability was its concern that the jury would have to speculate or
unreasonably "leap" in order to accept St. Paul's incendiarism
theory. It is true that if one fully accepts the testimony of
Malcolm and O'Donnell that the fire at the electrical panel in the
engine room ignited first, the timing of the fires appears somewhat
"odd." We do not believe, however, that this was sufficient reason
to withdraw the arson defense from the jury. The jury, not the
judge, is the fact-finder. The incendiarism element of an arson
defense does not require that the insurer prove the arsonist chose
the most logical or safest method for setting a fire, or that the
fire was carefully planned or pre-arranged by members of the
corporation. 
 It does not matter that the trial judge drew a different
inference or conclusion from the evidence presented or "[felt] that
other results [were] more reasonable." Boston & M.R.R. v. Caban,
148 F.2d 150, 152 (1st Cir. 1945). It was for the jury to weigh
the testimony of Malcolm and O'Donnell and all the other evidence
in order to determine whether the fire aboard the TWO FRIENDS was
deliberately set. Malcolm and O'Donnell both testified that at
least three, and possibly four, separate fires had been set, and
that there was no evidence of "communication" between them. 
O'Donnell testified that some of the samples taken from the vessel
showed traces of diesel fuel and that, in his opinion, the fire
located on the port side of the engine room had been set by someone
placing a container filled with accelerant in the forward port
corner of the engine room next to the hydraulic tank hoses. We
cannot say that a jury presented with this evidence lacked
sufficient basis from which to conclude that multiple fires were
deliberately set aboard the TWO FRIENDS. 
 The district court stated that it was aware of no case
"where the evidence of fraud is, or arson, is as thin and slender
as it is in this case." However, the evidence of arson presented
by St. Paul was similar in both substance and character to other
evidence found sufficient under Massachusetts case law to sustain
an arson defense. See Osvaldo, 362 Mass. at 864-65 (expert
evidence indicated presence of accelerant, insured's business
experiencing financial difficulties, and insured seen near premises
approximately one hour prior to fire); see also Richardson, 288
Mass. at 396-97 (fire incendiary in origin, doors and windows
locked when firemen arrived, and insured was "in need of money"), 
cf. Demoranville v. Star Ins. Co. of America, 319 Mass. 214, 215
(1946) (finding of arson not warranted where no evidence that
property burned was a bad investment, some of the windows could be
opened from outside, and no evidence to show how the fire started). 
As in Osvaldo and Richardson, the evidence in this case was
circumstantial in nature. Inferences can, of course, properly be
drawn from circumstantial evidence. Each case necessarily turns on
its own facts, and evidence of opportunity, for example, may be
stronger in one case than in another. The question is whether,
viewing all of the evidence in the light most favorable to St. Paul
and giving it the benefit of every legitimate inference, reasonable
jurors nonetheless could have come to but one conclusion, a
conclusion adverse to St. Paul. We conclude that reasonable jurors
could determine that F&D deliberately set fire to the TWO FRIENDS
in order to fraudulently obtain the proceeds of the insurance
policy. Therefore, we reverse the directed verdict in favor of
F&D.

C. Violation of Massachusetts Unfair Practices Statute
 The district court granted St. Paul's motion for summary
judgment on F&D's claim, brought pursuant to Mass. Gen. Laws chs.
93A and 176D, that St. Paul refused to settle the claim under the
Hull policy in bad faith. We review the district court's grant of
summary judgment de novo and view all facts in the light most
favorable to F&D, drawing all reasonable inferences in its favor. 
See Aponte Matos v. Toledo Davila, 135 F.3d 182, 186 (1st Cir.
1998).
 It is an unfair settlement practice, and also an unfair
or deceptive act or practice under Mass. Gen. Laws. ch. 93A, if
an insurance company fails "to effectuate prompt, fair and
equitable settlements of claims in which liability has become
reasonably clear." Mass. Gen. Laws ch. 176D, 3(9)(f). SeeEquitable Life Assurance Soc'y of the United States v. Porter-
Englehart, 867 F.2d 79, 88 (1st Cir. 1989) (those injured by
insurance practices proscribed by chapter 176D may sue under
chapter 93A). Section 3 of chapter 176D lists eleven unfair claim
settlement practices, including "[r]efusing to pay claims without
conducting a reasonable investigation based upon all available
information." Mass. Gen. Laws. ch. 176D, 3(9)(d). F&D does not
assert that St. Paul failed to conduct a reasonable investigation
before denying its claim, but rather bases its unfair practices
claim solely upon St. Paul's failure to pay under the Hull policy
when, after its investigation was completed, liability under the
policy was "reasonably clear."
 F&D has failed to point to sufficient evidence supporting
its unfair practices claim to avoid summary judgment. St. Paul's
refusal to settle the claim was based, in part, upon the expert
opinions of Malcolm and O'Donnell, who concluded that the fires
aboard the TWO FRIENDS had been deliberately set. We have
concluded that those opinions, along with the other evidence
supporting St. Paul's arson-by-the-insured defense, entitle St.
Paul to present the liability issue to the jury. Under these
circumstances, it cannot be said that liability is "reasonably
clear," even at this stage of the proceedings. Insurers are both
encouraged and entitled to rely, as St. Paul did here, on the
advice of expert consultants in evaluating liability. See Van Dykev. St. Paul Fire & Marine Ins. Co., 388 Mass. 671, 677-78 (1983)
(affirming summary judgment in favor of insurer on claim of failure
to settle where information provided by defense counsel and expert
witness established that liability was not reasonably clear); seealso DeMeo v. State Farm Mut. Auto. Ins. Co., 38 Mass. App. Ct.
955, 957 (1995) (liability not reasonably clear where objective
inquiry into applicable facts and law indicated 50% possibility
that driver other than insured would be found sole cause of
accident by jury).
 F&D attempts to bolster its unfair practices claim by
asserting that Malcolm's taking possession of the electrical panels
without obtaining F&D's permission and the belated production,
after trial, of the DuBois report, in which DuBois concurred with
the preliminary conclusion of the Gloucester Fire Department that
the cause of the fire aboard the TWO FRIENDS was electrical in
nature, constituted "unfair or deceptive act[s] or practice[s]"
under chapter 93A. 
 The unauthorized removal of the electrical panels and the
failure to produce the DuBois report, while disturbing, fail to
save F&D's Chapter 93A claim. In order to make out a claim under
chapters 93A and 176D, a claimant "must establish both that an
unfair trade practice occurred and that the unfair practice
resulted in a loss to the claimant." Alan Corp. v. Int'l Surplus
Lines Ins. Co., 22 F.3d 339, 343 (1st Cir. 1994) (italics in
original). There was no evidence that St. Paul removed the
electrical panels from the TWO FRIENDS for any improper purpose, or
that the delay in returning them to F&D caused any harm whatsoever
to F&D. Thus, F&D has failed to demonstrate that it suffered any
loss as a result of this conduct. 
 Respecting the late production of the DuBois report, this
 as the district court stated might more accurately be described
as a possible abuse of the discovery process than an unfair or
deceptive "business practice." In any event, F&D has not shown a
causal link between the late production of the DuBois report, which
was created prior to the completion of the investigation by Malcolm
and O'Donnell, and St. Paul's refusal to settle under the Hull
policy, the alleged loss to F&D, which was based upon the later
opinions of Malcolm and O'Donnell. 
 We affirm the district court's grant of summary judgment
in favor of St. Paul on the chapter 93A claim. We reverse the
court's ruling that losses caused by arson committed by a third
party are covered under the Hull policy, and reverse the directed
verdict in favor of F&D on the breach of contract claim. The
judgment on the breach of contract claim is vacated and the cause
remanded for further proceedings consistent with this opinion. 
Each side shall bear its own costs on these appeals.
 So ordered.